NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-254                                          Appeals Court

COMMONWEALTH  vs.  LESTER J. WILSON, JR.

No. 17-P-254.

Worcester.      June 21, 2018. - November 7, 2018.

Present:  Agnes, Blake, & Sacks, JJ.


Assault and Battery.  Evidence, Hearsay, Spontaneous utterance.
    Constitutional Law, Confrontation of witnesses, Harmless
    error.  Practice, Criminal, Hearsay, Confrontation of
    witnesses, Harmless error.  Error, Harmless.


    Complaint received and sworn to in the Fitchburg Division
of the District Court Department on September 29, 2015.

    The case was heard by Christopher P. LoConto, J.


    Brian J. Anderson for the defendant.
    Rose-Ellen El Khoury, Assistant District Attorney, for the
Commonwealth.


    AGNES, J.  The defendant, Lester J. Wilson, Jr., appeals

from his conviction of assault and battery on a family or

household member, G. L. c. 265, § 13M, following a jury-waived

trial in the District Court.  The principal question he presents

is whether the judge erred in ruling that statements made by the

defendant's wife (1) to a police dispatcher during a 911 call to report that the defendant had assaulted and threatened her, and (2) to one of the first responding police officers were admissible at the defendant's trial where his wife asserted spousal privilege. For the reasons that follow, we conclude that even if the statements qualified as excited utterances, most of them were testimonial in nature and therefore not admissible under the jurisprudence of the confrontation clause in the Sixth Amendment to the United States Constitution.[1] A confrontation clause violation is constitutional error.[2] The required remedy for a confrontation clause violation is a new trial unless the error was harmless beyond a reasonable doubt.[3]

---

[1] "The confrontation clause bars the admission of testimonial out-of-court statements by a declarant who does not appear at trial unless the declarant is unavailable to testify and the defendant had an earlier opportunity to cross-examine him." Commonwealth v. Simon, 456 Mass. 280, 296 (2010).

[2] "The Sixth Amendment to the United States Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' Similarly, art. 12 of the Massachusetts Declaration of Rights provides that 'every subject shall have a right to produce all proofs that may be favorable to him [and] to meet the witnesses against him face to face.'" Simon, 456 Mass. at 295. In cases like this, involving statements that are admissible under an exception to the hearsay rule, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment to the United States Constitution." Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1 (2006).

[3] See, e.g., Commonwealth v. Vasquez, 456 Mass. 350, 360 (2010).

Here, the incriminating character of the statements in question went far beyond the scope of the brief thirty-one-second portion of the 911 call that was properly admitted. Because we are not satisfied beyond a reasonable doubt that the improperly admitted evidence did not contribute to the judge's finding that the defendant was guilty, there must be a new trial. See Commonwealth v. Rodriguez, 445 Mass. 1003, 1004 (2005).

Background. The essential facts relating to the judge's rulings that are the subject of this appeal are not in dispute. Prior to trial, the judge conducted a hearing on the Commonwealth's motion in limine to admit the contents of a six-minute 911 call to the Fitchburg police department on September 27, 2015, and statements made by the defendant's wife to Fitchburg police Officer Keith Barnes ten to twenty minutes later when he arrived at the Fitchburg address that was associated with the 911 call. At the outset of this hearing, defense counsel informed the judge that the defendant's wife intended to assert spousal privilege and to decline to testify. See Mass. G. Evid. § 504(a) (2018). The judge conducted a voir dire with the defendant's wife and concluded that her decision to assert spousal privilege was voluntary. See Commonwealth v.

Szerlong, 457 Mass. 858, 864 n.10 (2010), citing Commonwealth v. Fisher, 433 Mass. 340, 350 (2001).

1.  911 call.  The judge listened to an audio recording of the six-minute 911 call.  This panel has listened to the same recording.[4]  It consists of two segments.  During the first minute or so, the defendant's wife requested that a police officer be sent to her home; she gave her name, address, and telephone number, and stated that she and her husband had argued.  She continued by stating that he "choked me out," and that he said he would be back in fifteen minutes to kill her.  After the dispatcher informed the caller that a police officer would be dispatched to her address, the caller was put on hold for about ninety seconds.  When the conversation resumed, the dispatcher asked whether the defendant told her how he planned to kill her.  The caller responded in the negative.  She then provided the dispatcher with the defendant's name.  After telling the caller that officers were on the way, the dispatcher asked her to "start from the beginning."

The caller then explained that there was an "ongoing thing for a long time" based on the defendant's belief that she is a "heroin junkie."  The defendant's wife strenuously denied that

---

[4] An audio recording of that call is part of the record on appeal.

she uses drugs.  She added that one week earlier, she and the defendant "got into a fight," and he "choked" her almost to the point of "suffocation."  When the dispatcher asked her about the events of that day, the caller informed him that today was their anniversary.  She said the defendant was angry because he said a person she was with in a photograph posted on the social media Web site Facebook was a heroin user.  She also informed the dispatcher that the defendant grabbed her by her throat, tried to suffocate her in a pillow, and tried to "shove a handful" of her migraine headache pills down her throat.  The call ended after the defendant's wife told the dispatcher that the defendant was not present, but rather was "out on the road" driving her son's red Honda CRV sport utility vehicle, which had one of the old "green" Massachusetts license plates.

The defendant argued that the statements made by his wife on the 911 call were not admissible as excited utterances because at the time she made them she was no longer under the stress of an exciting event.  See Commonwealth v. Burnett, 417 Mass. 740, 743-744 (1994).  Also, the defendant argued that the admission of these statements would violate his confrontation clause rights because the declarant was not available to cross-examine.  The judge ruled that the first portion of the recorded

911 call was admissible (until the point where the caller is put on hold), but that the remainder of the recorded call was not.[5]

2.  Statements made outside marital home.  The judge appropriately conducted a voir dire of Officer Barnes.  He testified that he was dispatched to the marital home on the night in question where he found the defendant's wife outside the home, talking to other officers.  In describing his interaction with the defendant's wife, Officer Barnes stated, "She was hysterical.  She was scared."  Officer Barnes further testified that it was difficult for him to calm her down; "she would start talking, and then she would start crying."  It took Officer Barnes ten minutes to get her to respond to questions about what had happened.  Although she was still upset during their conversation, she was "more composed" than she was when he arrived and was not crying.  When questioned about what he asked her, Officer Barnes testified, "I asked her how the whole thing started.  I asked her, you know, why this happened, what he [the defendant] was upset about, what exactly he said, questions like

---

[5] In explaining the reason for his ruling, the judge addressed whether the statements qualified as excited utterances, but did not independently address whether they were testimonial and thus subject to the confrontation clause.  See Simon, 456 Mass. at 295 (describing process of determining whether such statements are admissible as "two-step inquiry" in which hearsay question is addressed first followed by determination whether statements are testimonial and thus subject to confrontation clause).

that." The defendant's wife told Officer Barnes that the defendant had left the residence and said he would return in fifteen minutes. She gave Officer Barnes information about the vehicle the defendant was using and Officer Barnes issued a BOLO ("Be On the Lookout") bulletin to other officers. The defendant's wife told him that earlier that day, the defendant came home from work and accused her and a friend with whom she had appeared in a photograph posted on Facebook of being heroin addicts. "Then she told me that he attempted to choke her out and shove her head into a pillow. He went upstairs. He came back downstairs with a handful of pills." The judge ruled that all the statements made by the defendant's wife to Officer Barnes were admissible.[6]

3. Evidence at trial. The Commonwealth's case at trial consisted of the testimony of Officer Barnes and the first thirty-one seconds of the recorded 911 call. Officer Barnes testified that it took ten minutes for the defendant's wife to calm down. Officer Barnes further testified that he asked her

---

[6] In support of his ruling the judge cited three cases: Commonwealth v. Santiago, 437 Mass. 620 (2002); Commonwealth v. Grant, 418 Mass. 76 (1994); and Commonwealth v. Crawford, 417 Mass. 358 (1994). Although these cases are consistent with the law governing the excited utterance exception, they precede the seminal decision in Crawford v. Washington, 541 U.S. 36 (2004), and do not address the application of the confrontation clause. See DeOliveira, 447 Mass. at 57-58.

where the defendant was in order to ensure that he had left the scene and was not in the house. The defendant's wife informed Officer Barnes that the defendant left the premises and said that he would be back in fifteen minutes to kill her. Officer Barnes then testified, "I asked her to give me the rundown of exactly how it happened." He continued as follows: "She told me that she came home, that her husband —- or she was home. Her husband came home, and he was extremely upset right when he walked in, that he had seen a picture of her with a friend that he thought to be a drug addict. He accused her of being a drug addict. She went downstairs. He followed. He attempted to strangulate her and stick her head into a pill (sic) and suffocate her. He then went upstairs. He grabbed a handful of pills, tried to shove them down her throat, and said[,] 'If you want to be a drug addict, I'm going to make you a drug addict.'" On cross-examination, Officer Barnes added that the defendant's wife told him that the strangulation and the attempt to force her to ingest pills occurred on a "bed downstairs."

The defendant did not testify. The sole witness for the defendant was his son who testified that he was at home in the downstairs bedroom with the door locked during the time of the alleged crime. He added that his bedroom was the only bedroom on the first floor.

Discussion. 1. Admissibility of recorded 911 call. In circumstances in which the Commonwealth offers out-of-court statements made by a declarant who does not testify at trial, both the rule against hearsay and the confrontation clause come into play and require a "two-step inquiry." Commonwealth v. Simon, 456 Mass. 280, 295 (2010). The hearsay issue should be addressed first. Commonwealth v. Linton, 456 Mass. 534, 548 (2010).

a. Excited utterances. In determining whether an out-of-court statement qualifies as an excited utterance, the "essential issue is whether the statement was made under the stress of an 'exciting event and before the declarant has had time to contrive or fabricate the remark, and thus . . . has sufficient indicia of reliability.'" Commonwealth v. Baldwin, 476 Mass. 1041, 1042 (2017), quoting Commonwealth v. Zagranski, 408 Mass. 278, 285 (1990). See Mass. G. Evid. § 803(2) (2018). There is no requirement that the statement explain or qualify the underlying startling event. See Commonwealth v. Santiago, 437 Mass. 620, 625 (2002) (critical inquiry is what effect, if any, startling event had on declarant). The startling event that gives rise to the declarant's statement may be established by the excited utterance itself. Commonwealth v. Nunes, 430 Mass. 1, 4 (1999). The relevant factors to consider include whether the statement was made in the same location as the

startling event; the amount of time between the startling event and the making of the statement; and the age, spontaneity, and degree of excitement of the declarant. Baldwin, supra. "The circumstances enumerated are neither exhaustive nor mandatory; rather, the judge is to consider the particular circumstances in each case. . . . Further, the judge should not inquire as to whether the statement is in fact credible. . . . That task falls to the finder of fact." Commonwealth v. Joyner, 55 Mass. App. Ct. 412, 415 (2002). Finally, the mere fact that the declarant's statement is in response to questions does not necessarily disqualify it as an excited utterance. See Simon, 456 Mass. at 296 (shooting victim's answers to police dispatcher's questions during 911 call were "spontaneous reaction" to earlier home invasion and shooting). Contrast Commonwealth v. McCoy, 456 Mass. 838, 849 (2010) (statements made by victim of sexual assault during interview by sexual assault nurse examiner at hospital lacked requisite degree of spontaneity to qualify as excited utterances).

In the present case, the defendant argues that the portion of the 911 call admitted in evidence does not qualify as an excited utterance because there was no medical emergency, his wife did not exhibit "the characteristics of someone frantically calling 911," and his wife was "reflecting on the details of a past event." We disagree. Although the existence of a medical

emergency may contribute to a finding that the declarant was under the stress of an exciting event, it is not a foundation requirement for the hearsay exception.  As for the declarant's demeanor, the judge made a specific finding that the defendant's wife was crying during the initial portion of the 911 call.  In any event, a declarant may be under the stress of a startling event without appearing to be frantic or excited.  See Baldwin, 476 Mass. at 1042.  Finally, in order to meet the foundation requirements for the excited utterance exception, the proponent of the evidence is not required to demonstrate that the startling event was ongoing when the declarant made the statement.  Commonwealth v. Rodriguez, 90 Mass. App. Ct. 315, 319 (2016).[7]

---

[7] Certainly, there is a strong case for concluding that an out-of-court statement qualifies as an excited utterance when the facts indicate that the declarant made the statement while the crime was ongoing, see, e.g., Commonwealth v. Mulgrave, 472 Mass. 170, 176-177 (2015) (victim's text message that her husband was present and threatening to kill her); Commonwealth v. Galicia, 447 Mass. 737, 745 (2006) (declarant telephoned 911 and stated, "My husband is beating me up right now"), or immediately after being severely injured.  See, e.g., Commonwealth v. Beatrice, 460 Mass. 255, 259 (2011) (911 caller was "upset and breathing heavily," and reported that she had "just" been assaulted and needed an ambulance); Simon, 456 Mass. at 296 (declarant's statement made shortly after he suffered gunshot wounds during home invasion); Commonwealth v. Nesbitt, 452 Mass. 236, 246 (2008) (911 caller "sustained twenty-three stab wounds only moments before the call").  However, "our courts have not set a definite and fixed time limit on the excited utterance exception to the hearsay rule, but instead have held that a victim need only be still sufficiently agitated or 'under the influence of the exciting event' at the time the

We review a decision that an out-of-court statement qualifies as an excited utterance under the abuse of discretion standard.  We defer to the judge's decision unless we conclude that he failed to weigh properly the relevant factors with the result that the decision was outside the range of reasonable alternatives.  Id. at 318-319.  Here, after listening to the recorded 911 call (the only evidence that was available because the declarant had asserted spousal privilege), we are satisfied that the judge did not abuse his discretion in concluding that when the defendant's wife made the 911 call, she was both under the influence of the criminal assault that she was reporting had just occurred, and that what she related to the dispatcher during the admitted portion of the call was not the product of reflective thought.  See Commonwealth v. Beatrice, 460 Mass. 255, 258-259 (2011).[8]

_____

statement was made."  Commonwealth v. Wilcox, 72 Mass. App. Ct. 344, 351 (2008), quoting Commonwealth v. King, 436 Mass. 252, 254 (2002) (statement by declarant to emergency room doctor who treated her, made one hour after assault, qualified as excited utterance.  See Commonwealth v. Marshall, 434 Mass. 358, 364 (2001) (declarant's statement made while she was "crying and nervous" and "in fear" qualified as excited utterance even though made two hours after defendant threatened her with knife); Grant, 418 Mass. at 81-82 (one-hour interval between murder and declarant's statement, made while she was "hysterical," provided support for admission as excited utterance).

[8] For the first time on appeal, the defendant also challenges trial testimony by Officer Barnes that he recognized the voice on the recording of the 911 call as belonging to the

b.  Confrontation clause.  Although it does not appear that the judge separately considered the defendant's confrontation clause objection to the admission of the initial portion of the 911 call, there was no error.  The statements in question were made during a very brief conversation with a dispatcher for the police department.  The statements consisted of the declarant's request for police assistance; a brief description of the incident, including the defendant's threat to return in fifteen minutes to kill her; and her name and address.  The record supports the judge's finding that the declarant was crying as she spoke to the dispatcher.  In these circumstances, a reasonable person in the declarant's position would not have believed that the "primary purpose" of the statements was "to establish or prove past events potentially relevant to later criminal prosecution."  Davis v. Washington, 547 U.S. 813, 822 (2006).  Accord Michigan v. Bryant, 562 U.S. 344, 356-357 (2011); Simon, 456 Mass. at 298-299; Commonwealth v. Nesbitt, 452 Mass. 236, 247-248 (2008).  As the United States Supreme Court observed in Davis, supra at 827:  "a 911 call . . . is ordinarily not designed primarily to 'establis[h] or prov[e]'

---

defendant's wife. There was no error.  Officer Barnes testified that the basis for his voice identification was the conversation with the caller at the scene.  See Commonwealth v. Lykus, 367 Mass. 191, 201 n.4 (1975).  See also Mass. G. Evid. § 901(b)(5) (2018).

some past fact, but to describe current circumstances requiring police assistance." See Beatrice, 460 Mass. at 262 (in setting of 911 call in which declarant reported that she had been beaten by her boy friend, court regarded emergency as ongoing until "the arrival of the police or the departure of the defendant"). Contrast Commonwealth v. Lao, 450 Mass. 215, 226 (2007) (911 call was testimonial where made only after declarant spoke to defendant and two other people about incident).

2. Admissibility of statements made to Officer Barnes. a. Excited utterances. The statements made by the defendant's wife to Officer Barnes outside the marital home present a different and closer question. The defendant, though still at-large, was not on the scene, having left in their son's vehicle. In addition to Officer Barnes, other officers were present. Initially, the victim was very upset, but after ten minutes or so, she calmed down. The declarant did not request medical assistance. As noted above, Officer Barnes asked where the defendant was and, after learning that the defendant was no longer at the scene of the alleged crime, proceeded to ask the declarant "to give me the rundown of exactly how it happened." The focus of Officer Barnes's questioning quickly turned to past events. And the defendant's wife was repeating statements she had made previously to the police dispatcher during the second portion of the 911 call, which the judge excluded from the case.

These factors have a bearing on whether the declarant had time for reflective thought before her conversation with Officer Barnes. Nevertheless, the critical question is whether the declarant's responses were "a spontaneous reaction to the occurrence or event and not the result of reflective thought" (citation omitted). Santiago, 437 Mass. at 623. In light of the short interval of time between the startling event and the conversation between Officer Barnes and the defendant's wife, the degree to which she was upset and excited when Officer Barnes arrived on the scene, and the degree to which we customarily defer to evidentiary rulings by a trial judge, we cannot say that the judge abused his discretion in concluding that her statements outside the marital home qualified as excited utterances.[9]

---

[9] In Commonwealth v. McLaughlin, 364 Mass. 211, 221-222 (1973), the Supreme Judicial Court expressed the reasoning underlying the excited utterance or spontaneous exclamation exception to the rule against hearsay in terms drawn explicitly from Professor John Wigmore's treatise on the law of evidence:

"The exception to the hearsay rule which admits hearsay consisting of spontaneous exclamations 'is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the

b.  <u>Confrontation clause</u>.  Whether the conversation between Officer Barnes and the defendant's wife was subject to exclusion based on the confrontation clause presents a separate and fundamentally different question.  The initial statement made by the defendant's wife pertaining to the defendant's whereabouts

---

>       utterance may be taken as particularly trustworthy (or, at
>       least, as lacking the usual grounds of untrustworthiness),
>       and thus as expressing the real tenor of the speaker's
>       belief as to the facts just observed by him; and may
>       therefore be received as testimony to those facts.'
>       Wigmore on Evidence (3d ed.) § 1747."

See also 6 Wigmore on Evidence § 1747 (Chadbourn ed. 1972).  The reasoning employed by Professor Wigmore, and adopted "hook, line, and sinker" in McLaughlin, remains the foundation for the excited utterance exception in Massachusetts.  See Rocco v. Boston-Leader, Inc., 340 Mass. 195, 196-197 (1960); Mass. G. Evid. § 803(2) (2018), and cases cited.

However, the "Wigmorian" view, which is also reflected in Fed. R. Evid. § 803(2) (2017), has been severely criticized. "The entire basis for the [excited utterance] exception may . . . be questioned.  While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgement."  2 McCormick on Evidence § 272, at 366 (7th ed. 2013).  See United States v. Boyce, 742 F.3d 792, 802 (7th Cir. 2014) (Posner, J., concurring) ("Like the exception for present sense impressions, the exception for excited utterance rests on no firmer ground than judicial habit, in turn reflecting judicial incuriosity and reluctance to reconsider ancient dogmas").  Because this issue was not raised in any of the defendant's evidentiary objections, we have no need to consider it further.  See People v. Cummings, 31 N.Y.3d 204, 213-216 (2018) (Rivera, J., concurring).

was nontestimonial.[10]  Its purpose was "to describe current

circumstances requiring police assistance."  Davis, 547 U.S. at

827.  Indeed, as the Supreme Judicial Court stated in Beatrice,

460 Mass. at 262, quoting Davis, supra at 832:  "The Supreme

Court has recognized that, in domestic disputes, '[o]fficers

---

[10] Officer Barnes testified that his first concern was to determine whether the defendant was inside the home:  "She said that he left, but I wanted to make sure that he was gone.  I asked her what had happened, why it started."  When asked, "What was her response at that time," Officer Barnes testified, "She told me that he left and that he said that he was going to kill her in 15 minutes when he came home.  And then she told me that it started because of a picture that was posted on Facebook with her and a friend."  Officer Barnes next repeated his testimony that the defendant's wife "was very upset."  When asked by the prosecutor if he asked her "any other questions about that night," Officer Barnes testified, "I asked her to give me the rundown of exactly how it happened."  Officer Barnes then testified in detail about the events of that evening and what led up to the incident, as related to him by the defendant's wife.

Taken in context, we regard the brief testimony by Officer Barnes (totaling ten pages of transcript including direct and cross-examination) to describe two phases of his interrogation of the defendant's wife.  The first phase included his statements to calm her down and his inquiry about the location of the defendant.  Officer Barnes's testimony that the defendant's wife told him that the defendant had left the scene but said he would return "to kill her in 15 minutes when he came home," was properly admitted because the declarant's statements were made in response to Officer Barnes's attempts to determine if the defendant was on the scene.  However, the second phase during which Officer Barnes told the defendant's wife, "[G]ive me the rundown of exactly how it happened" and the declarant's response consisting of a detailed account of the incident and what led up to it (an account that involved facts not contained in the 911 call or any other evidence admitted at trial) was part of Officer Barnes's criminal investigation and was not designed to address an ongoing emergency.

called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim,' so such 'initial inquiries' often produce nontestimonial statements."[11]

However, "'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.'" Bryant, 562 U.S. at 365, quoting Davis, 547 U.S. at 828. Under one mode of analysis, the conversation at the scene between Officer Barnes and the defendant's wife took place after the defendant was no longer in the area, and when the scene was secure. This mode of analysis leads to the conclusion that due to the police presence, the

---

[11] In Commonwealth v. Gonsalves, 445 Mass. 1, 10 (2005), the Supreme Judicial Court defined the parameters of the confrontation clause in terms of statements that are "testimonial per se" and those that are "testimonial in fact." The former category described statements that are the result of interrogation by law enforcement officers who are performing an investigative function. Id. at 7-8. However, the court recognized that police officers interact with the public as well as victims of crime in other ways and for other purposes. When law enforcement officers are acting "to secure a volatile scene or to establish the need for or provide medical care," the questions they may ask are not regarded as "interrogation" and thus the statements made by victims and others are not regarded as falling within the scope of the confrontation clause. Id. at 9. "Rather, such questioning is considered part of the government's peacekeeping or community caretaking function, 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Id., quoting Commonwealth v. Evans, 436 Mass. 369, 372 (2002).

defendant's absence, and the fact that there was no need to provide the defendant's wife with medical services, the emergency was no longer ongoing.  See Beatrice, 460 Mass. at 262; Commonwealth v. Burgess, 450 Mass. 422, 429 (2008).  Under an alternative mode of analysis, the initial emergency that brought police officers to the home where the defendant and his wife resided was still ongoing when Officer Barnes had a conversation with the defendant's wife because she had earlier reported that the defendant planned to return home in a short time and kill her.  Under this mode of analysis, because an armed individual who had made a threat to kill his wife was still at-large, the scene was not secure despite the presence of police officers and the absence of a medical emergency.

However, regardless of which mode of analysis is employed to assess whether the statements in question were made while there was an ongoing emergency, the critical inquiry is what was the primary purpose of the interrogation by Officer Barnes. Nontestimonial statements are those "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  Davis, 547 U.S. at 822.  Testimonial statements are those made in circumstances in which "the primary purpose of the interrogation is to establish or prove past events potentially relevant to

later criminal prosecution." Id. Applying this test, the statements made to Officer Barnes, beyond those indicating that the defendant was no longer in the vicinity, were testimonial because "[n]othing in the record indicate[d] that [the officer's] questioning . . . was designed to secure the scene" or to "inquir[e] about any medical needs." Commonwealth v. Gonsalves, 445 Mass. 1, 16 (2005). Although the defendant's wife was initially upset and crying, "the primary purpose of the questioning was to learn what had happened." Rodriguez, 90 Mass. App. Ct. at 322.[12] After confirming with the defendant's wife that the defendant was no longer inside the home, the questions Officer Barnes asked the defendant's wife were pointedly about past events: "I asked her to give me the rundown of exactly how it happened." The defendant's wife responded to this line of questioning by providing a detailed description of the incident, stating that the defendant attempted to strangle her, to suffocate her with a pillow, and to shove pills down her throat.

---

[12] "[A] startled person who identifies a suspect in a statement made to a police officer at the scene of a crime surely knows that the statement is a form of accusation that will be used against the suspect. In this situation, the statement does not lose its character as a testimonial statement merely because the declarant was excited at the time it was made." Lopez v. State, 888 So.2d 693, 699-700 (Florida Dist. Ct. App. 2004).

The fact that the statements made to Officer Barnes were not the product of detailed interrogation, but instead were in response to open-ended questions, does not affect their character as testimonial. Davis, 547 U.S. at 822 n.1 ("Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation").

Apart from a consideration of the investigatory character of the questions asked by Officer Barnes, the statements made by the defendant's wife to a uniformed police officer outside the marital home were "testimonial in fact" because "a reasonable person in the declarant's position would anticipate the statement[s'] being used against the accused in investigating and prosecuting a crime." Gonsalves, 445 Mass. at 12-13. See Burgess, 450 Mass. at 431; Rodriguez, 445 Mass. at 1004. Here, as in Commonwealth v. Galicia, 447 Mass. 737, 746 (2006), a case involving facts that are remarkably similar to those in the present case, "[t]he interview itself took on the more formal cast of a police investigation of a crime." Even if we take into account the knowledge possessed by Officer Barnes and his purpose in questioning the defendant's wife at the scene, see Beatrice, 460 Mass. at 260 n.7, the result is the same -- an investigating police officer was gathering historical facts about a reported crime. For these reasons, the judge erred in

failing to exclude all but the introductory statements made by the defendant's wife to Officer Barnes.

The dissent takes the position that the statements made by the defendant's wife at the scene were nontestimonial and their admission in evidence thus did not violate the defendant's rights under the confrontation clause. Post at     . The dissent focuses, in part, on Officer Barnes's statement in which he said, "The main thing I was worried about was where is [the defendant]" in concluding that Officer Barnes's primary purpose in questioning the defendant's wife was to secure the scene of the alleged crime. Post at     . However, when Officer Barnes's testimony is examined in context, it is evident that his concern about the defendant's whereabouts was satisfied when the defendant's wife told him that the defendant had left the scene. The remainder of the conversation between the defendant's wife and Officer Barnes was concerned exclusively with historical facts about the alleged crime and what led up to it. See Bryant, 562 U.S. at 365 (conversation that begins as inquiry to determine need for emergency assistance can evolve into testimonial statements).

In determining the primary purpose of a police interrogation, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants

would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. at 360. In differentiating between nontestimonial and testimonial statements made during a 911 call, the Court in Davis noted that the former statements were "about events as they were actually happening, rather than 'describ[ing] past events,'" (citation omitted) consisted of "a call for help against a bona fide physical threat," and were "necessary . . . to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past." Davis, 547 U.S. at 827. Here, using these characteristics of nontestimonial statements as a guideline, the primary purpose of the statements made by the defendant's wife to Officer Barnes at the scene, in response to his question about "how the whole thing started," was "to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822.

The testimonial character of the narrative about what led up to the alleged physical attack conveyed by the defendant's wife and Officer Barnes is further illustrated by the United States Supreme Court's analysis of the facts in Hammon v. Indiana, the companion case decided in the same opinion as Davis. See Davis, supra at 819-821. In Hammon, like the present case, the question before the Court was whether

statements made by the declarant, who was the defendant's wife, to police officers at the scene were testimonial. Id. at 829. It was a chaotic scene -- the declarant was on the front porch when the police arrived. Id. at 819. The police were given permission to enter the home. Id. The police observed a flaming gas heater that was overturned. Id. The floor was covered with pieces of broken glass. Id. The defendant was in the kitchen. Id. He told the police that he and the declarant had argued, but that "everything was fine now." Id. When the police took the declarant aside to question her, the defendant tried to intervene and "became angry" when told he would have to remain separated from the declarant. Id. at 820. The declarant gave an account of the events, explaining that the defendant broke the furnace and shoved her to the floor onto the broken glass. Id. She also told the police that the defendant hit her in the chest and attacked their daughter. Id. The Indiana Supreme Court ruled that the declarant's statements to the police at the scene were nontestimonial. Id. at 821. The United States Supreme Court disagreed. As the Court said, "When the officer questioned [the declarant] for the second time, and elicited the challenged statements, he was not seeking to determine (as in Davis) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible

crime -- which is, of course, precisely what the officer should have done." Id. at 830. This was so notwithstanding that the angry defendant remained on the scene and attempted to participate in the declarant's conversations with the police. Id. at 819-820.

Here, just as in Hammon, the statements made by the defendant's wife "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. Moreover, in the present case, unlike in Hammon, the conversation took place after the defendant left the scene. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial." Id.

In the cases relied on by the dissent, the statements made by the alleged victims were deemed testimonial. See Galicia, 447 Mass. at 746; Gonsalves, 445 Mass. at 16-17; Rodriguez, 90 Mass. App. Ct. at 327. The dissent attempts to distinguish these cases on the basis that, "Given this, the defendant's threat to return to the home to kill the victim underscores the emergency that existed at the time." Post at      . This is inconsistent with the Massachusetts definition of what constitutes an ongoing emergency in domestic violence cases. The Galicia case is particularly instructive. After explaining

that a domestic violence victim's statements to the 911 dispatcher were nontestimonial, for the same reasons given in Davis, the court concluded that the victim's statements to responding police officers at the scene, after "the assault had ended and the urgency had subsided," were not elicited primarily to enable the police to meet an ongoing emergency and thus were testimonial.  447 Mass. at 745.  Additionally, in Beatrice, 460 Mass. at 262, the court recognized that the "arrival of the police or the departure of the defendant" dispels any further threat to a victim of domestic violence and thus terminates any preceding emergency.[13]  See Simon, 456 Mass. at 300 ("The victim's two statements describing the shooting in great detail related to past events; they were not relevant to resolving the medical emergency, securing the crime scene, or protecting emergency personnel responding to the call").  See Bryant, 562 U.S. at 363 ("Domestic violence cases . . . often have a narrower zone of potential victims than cases involving threats to public safety").

---

[13] This statement from Beatrice that the arrival of the police eliminates the threat to a victim of domestic violence refers only to the definition of an ongoing emergency for the purpose of a confrontation clause analysis.  In a larger sense, many victims of domestic violence remain in danger of being injured or killed by their perpetrators after involvement by the police, and, regrettably, even after the victim obtains an abuse prevention order.

Likewise, for the reasons expressed by the Supreme Court of New Jersey, the dissent's "expansive definition" of "ongoing emergency" is not consistent with the understanding of the confrontation clause expressed in Davis:

> "Like in Hammon, the non-testifying witness here told the police officer 'what had happened.'. . . There was no ongoing emergency -- no immediate danger -- implicating either the witness or the victim, both of whom were in the company of police officers at the time of the 'interrogation' at Public School 30. We disagree with the State and Attorney General's argument that we should interpret 'ongoing emergency,' for Confrontation Clause purposes, in a way that would allow the use of testimonial hearsay narrating a past crime so long as the suspects are at large, even when neither the declarant nor victim is in danger. Such an expansive definition was implicitly rejected by the Davis Court. Indeed, in Davis, after the abusive husband fled his home, ending the immediate emergency, the Court declared that '[i]t could readily be maintained' that the wife's continuing remarks to the 911 operator were testimonial statements. . . .
>
> "Our reading of Davis leads us to conclude that a declarant's narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is testimonial. See [Davis, 547 U.S. at 827-828, 830] (noting that victim in Davis was facing 'a bona fide physical threat' while on 911 call whereas victim in Hammon did not have 'immediate threat to her person' while speaking with officer)."

State ex rel. J.A., 195 N.J. 324, 348-349 (2008). See State v. Lewis, 361 N.C. 541, 549 (2007) (primary purpose of on-scene questions by police and answers by victim was not to resolve ongoing emergency even though defendant's location was unknown); State v. Koslowski, 166 Wash. 2d 409, 426-427 (2009) (en banc) (mere fact that suspects were armed and at-large not sufficient

to demonstrate that police questions and declarant-victim's statements at scene were necessary to resolve ongoing emergency).

3. Harmless error analysis. "[I]f a constitutional right has been preserved and there has been no waiver, then it can only be ignored if we are convinced that the error was harmless beyond a reasonable doubt." Commonwealth v. Amirault, 424 Mass. 618, 649 (1997). "Where the defendant's constitutional right to cross-examine has been denied, the prosecution bears the burden of establishing that the error was harmless." Commonwealth v. Vardinski, 438 Mass. 444, 452 (2003). See Commonwealth v. Brazie, 66 Mass. App. Ct. 315, 317 n.1 (2006). Under this standard, the "essential question" we ask is "whether the error had, or might have had, an effect on the [fact finder] and whether the error contributed to or might have contributed to the [finding of guilty]." Commonwealth v. Perrot, 407 Mass. 539, 549 (1990). In order to meet the harmless error test, we must be satisfied "beyond a reasonable doubt that the tainted evidence did not have an effect on the [fact finder] and did not contribute to the [fact finder's findings]." Commonwealth v. Tyree, 455 Mass. 676, 701 (2010). Ultimately, the question "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely

unattributable to the error" (citation omitted).  Commonwealth

v. Vasquez, 456 Mass. 350, 361 (2010).

Contrary to the view expressed by the dissent, post

at      , the constitutional harmless error standard that

governs a confrontation clause violation is not satisfied simply

because the erroneously admitted evidence is cumulative of other

properly admitted evidence.  Instead, "[w]e consider several

factors to determine whether the error was harmless:  'the

importance of the witness'[s] testimony in the prosecution's

case, whether the testimony was cumulative, the presence or

absence of evidence corroborating or contradicting the testimony

of the witness on material points, the extent of cross-

examination otherwise permitted, and, of course, the overall

strength of the prosecution's case.'"  Vardinski, 438 Mass. at

452, quoting Commonwealth v. DiBenedetto, 414 Mass. 37, 40

(1992), S.C., 427 Mass. 414 (1998).  "We resolve all ambiguities

and doubts in favor of the defendant."  Vardinski, supra at 452-

453, citing Commonwealth v. Maxim, 429 Mass. 287, 291-292

(1999).

First and foremost, the error in this case was not harmless

because the Commonwealth cannot demonstrate that other admitted

evidence of guilt is "'overwhelming,'" in the sense that it is

'so powerful as to "nullify any effect"' that the improperly

admitted evidence 'might have had' on the fact finder or the

findings" (citations omitted). Vasquez, 456 Mass. at 362, quoting Tyree, 455 Mass. at 704 n.44. See Commonwealth v. Mendes, 463 Mass. 353, 358-359 (2012). Here, without the erroneously admitted evidence, the Commonwealth's case consisted almost exclusively of a thirty-one-second recorded 911 call that described a completed assault and battery. The only other live witness with firsthand knowledge was the defendant's son, who testified that he was in the only bedroom on the first floor of the home with the door locked during the time of the alleged crime.

Second, the erroneously admitted testimony by Officer Barnes placed before the judge significant facts that were not included in the statements made by the defendant's wife during the first thirty-one seconds of her 911 call or in her initial statements to Officer Barnes at the scene. During the 911 call, the defendant's wife stated that she was "choked" by the defendant and that he threatened to kill her. Her initial statements to Officer Barnes repeated this information. However, the improperly admitted statements, relayed through Officer Barnes at trial, added that the defendant not only "choked" his wife, but also attempted to strangle her, stuck her head in a pillow in an attempt to suffocate her, and attempted to forcibly shove a handful of pills down her throat. The erroneously admitted testimony by Officer Barnes also supplied

the judge with a motive for the defendant's acts -- his belief that his wife was a heroin addict and was in the company of other heroin users. This evidence went well beyond the scope of his wife's statements made to the 911 dispatcher, and provided the judge with independent bases on which the defendant could be convicted under G. L. c. 265, § 13M. See Instruction 6.275 of the Criminal Model Jury Instructions for Use in the District Court (2016).

This is a case in which the erroneously admitted evidence was not collateral or tangential -- it went to the heart of the case. See Commonwealth v. Thornley, 406 Mass. 96, 102 (1989). In the absence of findings of fact to explain the reasons for the judge's guilty finding in this case, we cannot say, beyond a reasonable doubt, that the erroneously admitted evidence did not contribute to the finding that the defendant was guilty. See DiBenedetto, 414 Mass. at 41. Contrast Galicia, 447 Mass. at 747-748 (improperly admitted testimonial statements made to responding officers at crime scene harmless beyond a reasonable doubt where observations of officers, including that victim was wounded and man wearing no shirt was standing in room with overturned chairs, tended to show that domestic violence incident had taken place, and on-scene statements of victim served merely to corroborate information previously provided by victim during 911 call).

Conclusion.  In order to understand the result we reach --

that a recorded 911 emergency telephone call in which the

defendant's wife reported that she had been physically attacked

by the defendant who allegedly threatened to return in fifteen

minutes and kill her, was admissible in evidence without

testimony by the declarant, but that most of her brief

conversation at the scene with Officer Barnes shortly thereafter

was not, and that as a result there must be a new trial, it is

important to consider what Justice Scalia wrote in Crawford v.

Washington, 541 U.S. 36, 61 (2004), in untangling the

confrontation clause from the rule against hearsay:

> "To be sure, the Clause's ultimate goal is to ensure
> reliability of evidence, but it is a procedural rather than
> a substantive guarantee.  It commands, not that evidence be
> reliable, but that reliability be assessed in a particular
> manner:  by testing in the crucible of cross-examination.
> The Clause thus reflects a judgment, not only about the
> desirability of reliable evidence (a point in which there
> could be little dissent), but about how reliability can
> best be determined."[14]

---

[14] This point -- that the confrontation clause demands more
than simply assurances of reliability with regard to statements
by the defendant's accusers, but also preserves the right of the
accused to encounter his accusers -- is critically important.
As the United States Supreme Court observed in Coy v. Iowa, 487
U.S. 1012, 1017 (1988), "The Sixth Amendment's guarantee of
face-to-face encounter between witness and accused serves ends
related both to appearances and to reality.  This opinion is
embellished with references to and quotations from antiquity in
part to convey that there is something deep in human nature that
regards face-to-face confrontation between accused and accuser
as 'essential to a fair trial in a criminal prosecution'"
(citation omitted).  See generally Herrmann and Speer, Facing
the Accuser:  Ancient and Medieval Precursors of the
Confrontation Clause, 34 Va. J. Int'l L. 481, 481 (1994)

When a person is on trial and is charged with a crime, the confrontation clause is much more than a judicial assurance that a declarant's out-of-court statement is reliable.  Enforcement of the confrontation clause "(1) insures that the witness will give his statements under oath -- thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; . . . [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."  California v. Green, 399 U.S. 149, 158 (1970).  Likewise, the Supreme Judicial Court has reasoned that cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested."  Commonwealth v. Funches, 379 Mass. 283, 292 (1979), quoting Davis v. Alaska, 415 U.S. 308, 316 (1974).  See United States v. Salerno, 505 U.S. 317, 328 (1992); United States v. Caudle, 606 F.2d 451, 457 (4th Cir. 1979).

---

(debunking conventional belief that Sir Walter Raleigh's rejected demand to meet witness against him "face-to-face" at trial for treason in 1603 marked origin of right to confrontation, and explaining Roman and Canon law origins of confrontation clause).

Admitting testimonial evidence of significance without the opportunity to cross-examine the source of that evidence -- in this case his accuser -- deprived the defendant of his right to confrontation and a fair trial.

<u>Judgment vacated</u>.

<u>Finding set aside</u>.

BLAKE, J. (dissenting).  Because I believe that the victim's statements to Fitchburg police Officer Keith Barnes were properly admitted to enable the police to respond to an ongoing emergency, and were therefore nontestimonial, I respectfully dissent.  I agree with the majority's thoughtful explanation that the statements in the admitted portion of the 911 call qualify as excited utterances, an exception to the hearsay rule.  See Mass. G. Evid. § 803(2) (2018).  I also agree that the victim's statements to Barnes made outside of the home qualify as excited utterances.  However, unlike the majority, I believe the statements to Barnes are nontestimonial because they were "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency."  Davis v. Washington, 547 U.S. 813, 822 (2006).  "The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight."  Michigan v. Bryant, 562 U.S. 344, 361 n.8 (2011).  When considering whether the primary purpose of the police inquiry is to meet an ongoing emergency, "the guiding consideration is whether 'the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief [is] later proved

incorrect.'  Thus, the 'primary purpose' inquiry is divorced from the subjective or actual intentions of the individuals involved in a particular encounter."  Commonwealth v. Smith, 460 Mass. 385, 392 (2011), quoting Bryant, supra at 359, 361 n.8.

Applying these constitutional principles to the facts here, I believe that Barnes's testimony was nontestimonial.  The victim had been recently strangled, and was still in distress when the police arrived.  She displayed fear that the defendant would make good on his promise and return to kill her.  There was still a real potential of further danger to the victim, and possibly to the police.  See Bryant, 562 U.S. at 363 (in domestic violence cases, part of assessment of "the ongoing emergency [is] from the perspective of whether there was a continuing threat to [the victim]").  The questioning here was rooted in the community caretaking function of the police.  Barnes was right to concern himself with obtaining a "rundown" of the attack in an effort to locate the defendant and to prevent further harm, particularly in the context of an unsecured scene.  See Commonwealth v. Tang, 66 Mass. App. Ct. 53, 59-60 (2006).  Indeed, Barnes explicitly stated that "[t]he main thing [he] was worried about was where is [the defendant]."  He also testified that during this conversation, the victim was "hysterical," "extremely upset," and "crying."  Because of the victim's emotional state, it was "tough" for Barnes "to figure

out what was going on."  The victim, "like any person in [her] position, would have been consumed by the immediacy of the situation . . ., [therefore it] 'is almost inconceivable that, moments after [the assault] . . . [she] could have spoken in contemplation of a future legal proceeding.'"  Commonwealth v. Nesbitt, 452 Mass. 236, 249 (2008), quoting Tang, supra at 60-61.  On cross-examination, Barnes again confirmed that he "wanted to make sure [the defendant] wasn't in the area."  See Nesbitt, supra.

The cases cited by the majority are not to the contrary. Indeed, the facts in those cases stand in stark contrast to the facts presented here -- an imminent threat to return to do more harm.  Cf. Commonwealth v. Galicia, 447 Mass. 737, 745 (2006) (victim's statements to officers were testimonial where officer testified that when he arrived, he "determined that the scene was safe").[1]  The fact that the defendant did not return to the scene while the police officers were present is of no moment as the question is whether "the information the parties knew at the

---

[1] The fact that the victim refused medical attention does not itself nullify the nature of the ongoing emergency.  Rather, "[t]he medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions . . . [and] provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public." Bryant, 562 U.S. at 364-365.

time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect."  Commonwealth v. Beatrice, 460 Mass. 255, 259-260 (2011), quoting Bryant, 562 U.S. at 361 n.8.

The ongoing nature of the emergency was also particularly acute because the defendant strangled the victim before leaving the scene.  Studies of domestic violence have found that "non-lethal strangulation is an important predictor for future lethal violence among women who are experiencing [intimate partner violence]."  Glass, Laughon, Campbell, Block, Hanson, Sharps, and Talliaferro, Non-Fatal Strangulation is an Important Risk Factor for Homicide of Women, 35 J. of Emergency Med. 329, 335 (2008).  In fact, "the odds of becoming an attempted homicide victim increased by 700 percent, and the odds of becoming a homicide victim increased by 800 percent for women who had been strangled by their partner."  Strack and Gwinn, On the Edge of Homicide:  Strangulation as a Prelude, 26 Crim. Just. 32, 34 (Fall 2011).

Given this, the defendant's threat to return to the home to kill the victim underscores the emergency that existed at the time.  See Davis, 547 U.S. at 827; Beatrice, 460 Mass. at 260-262.  Put another way, the circumstances that Barnes encountered qualified as an ongoing emergency extending beyond the strangulation itself.  As such, the statements "were made 'in

circumstances that reasonably negated premeditation.'" Beatrice, supra at 258-259, quoting Commonwealth v. Santiago, 437 Mass. 620, 625 (2002).

However, even if the statements were admitted in error, they were cumulative of the properly admitted portion of the 911 call and the victim's initial statements to Barnes at the scene, and thus harmless beyond a reasonable doubt. See Commonwealth v. Perez, 411 Mass. 249, 260-261 (1991) (even if erroneously admitted, evidence that was merely cumulative was harmless beyond reasonable doubt). In Galicia, 447 Mass. at 747-748, "[t]he victim's improperly admitted statements to the officers, that her husband punched, choked, and kicked her, only corroborated the properly admitted evidence -- her report of abuse at the hands of her husband and officers' subsequent observations. Thus, the 'erroneously admitted evidence was "merely cumulative" of evidence properly before the [fact finder]'" (citation omitted). As in Galicia, here, the victim's statements were not evidence that "had, or might have had, an effect on the [fact finder] and . . . contributed to or might have contributed to the verdicts." Commonwealth v. Perrot, 407 Mass. 539, 549 (1990). Accordingly, to the extent that any statements were improperly admitted, they were harmless beyond a reasonable doubt, particularly in a bench trial. See Commonwealth v. Milo M., 433 Mass. 149, 152 (2001), quoting

Commonwealth v. Colon, 33 Mass. App. Ct. 304, 308 (1992) (in bench trial, "the legal framework in which facts are to be found is not generally stated with the precision and amplitude of instructions to a jury [and] it is presumed that the judge as trier of fact applies correct legal principles").  For these reasons, I respectfully dissent.