NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| ERIC GOMEZ, | Court of Appeals No. A-13169 |
| Appellant, | Trial Court No. 3AN-15-02989 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2731 — August 12, 2022 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Jack W. Smith, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Clyde "Ed" Sniffen Jr., Acting Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

Following a jury trial, Eric Gomez was convicted of attempted first-degree sexual assault of C.H.[1]  Although C.H. did not testify at trial, the trial court allowed the State to introduce recordings of her prior statements — first, the initial portion of her 911 call, and second, the initial portion of her interview with a police officer who responded to the scene.  The primary question presented in this appeal is whether the admission of these statements violated Gomez's constitutional right to confrontation.

For the reasons explained in this opinion, we conclude that the introduction of the initial portion of C.H.'s 911 call did not violate Gomez's right of confrontation.  However, we conclude that the introduction of C.H.'s later on-scene statements to the police officer, describing past events from a position of remove and safety, did violate Gomez's right of confrontation, and that the admission of these statements was not harmless beyond a reasonable doubt.  We therefore reverse Gomez's conviction.

*Underlying facts*

In April 2015, Eric Gomez had just moved to Anchorage and was living in a two-bedroom apartment with his sister, her husband and children, and a man named Salvador.  On the evening of April 7, Gomez and Salvador met C.H. at a bus stop and invited her back to their apartment to drink.  C.H. agreed, and the three took a taxi together.  They purchased liquor along the way and, when they reached the apartment, they began drinking in one of the bedrooms.

Several hours later, at around 3:30 a.m., 911 dispatch received a call from C.H., asking officers to come to the apartment building because "the guy downstairs is pulling a knife out on everybody."  C.H. said that the man had "just pulled [her] pants off, and he held a knife to [her] neck and tried to rape [her]."  C.H. explained that the

---

[1]    AS 11.41.410 & AS 11.31.100.

incident had occurred in a different apartment, Apartment #1 and — after another person had intervened and she was able to escape — she fled to an apartment upstairs, Apartment #4, where the residents had let her in.

Several Anchorage police officers responded to the 911 call. The first officers to arrive on the scene went to Apartment #1, the reported scene of the incident.

Officer Jean Mills arrived on the scene a short time later. After observing multiple officers already outside Apartment #1, Mills proceeded to the upstairs apartment to make contact with C.H.

Upon entering the upstairs apartment, Mills observed C.H. sitting on the floor, partially dressed and crying. Mills asked C.H., "[C]an you give me a description of what happened?" C.H. stated that she had met Gomez and Salvador downtown, and that they had invited her to their apartment. C.H. reported that, at some point, after they began drinking, "Eric" held a knife to her neck and "was trying to rape me," but Salvador came into the bedroom, confronted Gomez, and began fighting with him. At that point, C.H. fled to the neighbor's apartment. Mills asked C.H. if she was injured, and C.H. replied, "I don't know. He held [a knife] to my neck, and I just told him to take what he wanted because I was scared."

Just as Mills starting talking with C.H., she heard some commotion in the hallway. Mills briefly stepped outside of the apartment and observed several officers placing a man — later identified as Gomez — in handcuffs.

Pursuant to warrants, the police searched both Gomez and his apartment. The police found C.H.'s identification and cell phone on Gomez's person, C.H.'s boots in the entryway of the downstairs apartment, and other forms of C.H.'s identification in the bedroom.

After the interview, Mills took C.H. to a facility for a sexual assault examination, during which a nurse observed a red bruise on C.H.'s neck.

Following his arrest, Gomez was taken to the police station, where Detective Leonard Torres interviewed him in Spanish — Gomez's native language. During this interview, Gomez acknowledged that he had met C.H. at a bus stop, stating that "[f]rom the moment I took her home it was a bad decision." According to Gomez, he told C.H. upon meeting her that he wanted to have sex with her, but after arriving at his apartment, she wanted only to drink. When Torres asked how C.H. had gotten a red mark on her neck, Gomez replied that he did not know. Torres pressed Gomez, rejecting his explanation that he had "just grabbed her." When Torres asked Gomez whether he had grabbed a knife, Gomez responded, "I don't remember. It could be." In response to further questioning about the knife and whether Gomez had placed a knife against C.H.'s neck, Gomez first replied that he did not remember because he had been drinking, but ultimately answered, "Well, I think so. If she has a mark, well, then I guess so."

*Prior proceedings*

A grand jury indicted Gomez on one count of attempted first-degree sexual assault.[2] Prior to trial, the State informed the court that C.H. would likely be unavailable to testify at trial. (The record indicates that C.H. had moved out of Alaska while this case was pending and was not cooperative with the State.) Gomez filed a motion seeking to exclude the recordings of both C.H.'s 911 call and Officer Mills's subsequent interview with C.H. Gomez argued that the introduction of these statements would violate his confrontation rights under the United States and Alaska Constitutions because, according to Gomez, the statements were testimonial, and he had not had a prior opportunity to cross-examine C.H.

---

[2]    AS 11.41.410 & AS 11.31.100. The grand jury also indicted Gomez on one count of third-degree assault and one count of coercion, AS 11.41.220(a)(1)(A) and AS 11.41.530(a)(1), but the State dismissed these counts prior to trial.

At a hearing, the prosecutor stated that he intended to play only the initial portions of the 911 call and C.H.'s interview with Mills. The prosecutor acknowledged that, even by the time of the 911 call, the emergency had "dissipated a little bit," and that the later portions of both of C.H.'s statements appeared more testimonial.[3] But he maintained that the initial portions of C.H.'s conversations with the 911 dispatcher and Officer Mills were non-testimonial: the 911 call because the dispatcher was trying to coordinate a police response to an "ongoing, volatile situation," and the statements to Mills because, although Gomez was detained by that point, the police were still trying to sort out what had happened and who was involved.

Gomez's attorney conceded that her argument with respect to the 911 call was "much weaker" than her argument about C.H.'s statements to Officer Mills, and she focused primarily on the admissibility of the latter statements. Emphasizing the nature of Mills's questioning and the fact that C.H. was in another apartment behind closed doors, the attorney argued that the primary purpose of Mills's interview with C.H. was "investigatory." In particular, the defense attorney argued that Mills was taking an "initial statement" from C.H. for purposes of litigation and that C.H.'s statements to Mills were therefore testimonial.

Before the court ruled, the prosecutor played excerpts of the initial portions of the 911 call and C.H.'s later statements to Officer Mills — those portions that the prosecutor intended to play at trial.[4] The court subsequently ruled that the proposed

---

[3] *See Michigan v. Bryant*, 562 U.S. 344, 365 (2011) (recognizing that an interview can transition from non-testimonial to testimonial).

[4] Prior to ruling, the court also independently listened to the entire 911 call, during which C.H. ultimately provided the first names of the individuals involved and a description of the suspect's clothing.

excerpts were non-testimonial and that their admission did not violate Gomez's confrontation rights.

At trial, the State did not call as witnesses any of the individuals who were present at the time of the incident — C.H., Salvador, Gomez's sister, or her husband. Rather, the State relied on the excerpts from C.H.'s 911 call and her interview with Mills, as well as on the testimony of law enforcement witnesses, representatives from the crime laboratory, and the nurse who performed the sexual assault examination. The State also introduced the recording of Gomez's interview with Detective Torres, during which Gomez appeared to confess to some of C.H.'s allegations.

In his defense, Gomez sought to cast doubt on the reliability of his statements, with defense counsel cross-examining Torres about his interrogation technique and the fact that Torres and Gomez spoke different variants of Spanish.

Gomez also challenged C.H.'s credibility and her version of events. Past and present members of Gomez's defense team testified that, across a series of conversations, C.H. had reported that she suffered from bipolar disorder, was not taking her medication at the time of incident, and sometimes had difficulty distinguishing reality from fantasy. C.H. also stated that she did not want to participate in the grand jury proceeding — and ultimately, she did not testify before the grand jury — and that she did not want Gomez to be prosecuted (although she maintained that he had assaulted her).

As part of the defense case, three Anchorage police officers testified about their own prior encounters with C.H. One officer testified that he had previously responded to a call for assistance from C.H. and noted that she smelled of alcohol — indeed, she told the officer that she was "very intoxicated" at the time of the incident she had called to report — and he found her "difficult . . . to get information from." Another

officer testified that he had charged C.H. with making a false report after he stopped her in a closed park and she made up a story about someone nearby attempting suicide.

Additionally, Police Officer Alan Skaggs testified that he had responded to a disturbance involving C.H. less than a year before the events of this case. There, a seemingly intoxicated C.H. had repeatedly asked Skaggs not to arrest her, worrying that she would be sent "out of state" and separated from her children if she were charged.[5] When Officer Skaggs did take her into custody, C.H. asserted that she had only begun drinking because she had been raped about an hour-and-a-half earlier. She claimed that the assailant had asked her to drink with him before showing her a knife and forcefully having sex with her. In response, C.H. began, but did not complete, a sexual assault examination. When she was later interviewed by a defense investigator as an eyewitness in an unrelated case against the alleged assailant, C.H. made no mention of the rape, instead speaking highly of the alleged assailant.

In closing, Gomez relied on all of this evidence to argue that C.H. was not credible and had a motivation to lie. Defense counsel argued that C.H. had fabricated the allegation because she was afraid of going to jail or losing her children after violating her probation by drinking with Gomez. The attorney also highlighted C.H.'s lack of cooperation with the prosecution, absence at trial, previous police encounters, and mental health and memory issues. Additionally, the attorney challenged the reliability of Gomez's statement to Detective Torres, arguing that Torres had an overbearing interview

---

[5] At trial, a probation officer testified that, at the time of C.H.'s interaction with Officer Skaggs, C.H. was on felony probation for a California offense, prohibited from drinking alcohol, and could be extradited for probation violations. C.H.'s case manager at the Office of Children's Services also testified that, at least at the time of the events in Gomez's case, C.H.'s case plan prohibited her from consuming alcohol.

style that created a situation in which Gomez did not fully understand what he was agreeing to.

The jury rejected this defense and found Gomez guilty of attempted first-degree sexual assault. This appeal followed.

*A brief overview of relevant confrontation clause case law*

Both the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Alaska Constitution guarantee a criminal defendant the right "to be confronted with the witnesses against him." On appeal, Gomez argues that the trial court erred when it allowed the State to introduce portions of C.H.'s statements from the 911 call and from her interview with Officer Mills. Gomez contends that because C.H. did not testify at trial, and he had no prior opportunity to cross-examine her, these statements were introduced in violation of his right to confrontation.

In *Crawford v. Washington*, the United States Supreme Court held that the confrontation clause of the Sixth Amendment bars the admission of "testimonial" hearsay statements against a criminal defendant unless (1) the hearsay declarant is available to be cross-examined, or (2) the government establishes that the hearsay declarant is unavailable, and the defendant had a prior opportunity to cross-examine the declarant.[6] The Court held that statements made by a witness during prior testimony under oath, or during a formal police interrogation, are testimonial, but the Court otherwise refrained from providing a comprehensive definition of the term.[7]

Two years later, in the companion cases of *Davis v. Washington* and *Hammon v. Indiana*, the Supreme Court further defined the meaning of "testimonial."

---

[6]   *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

[7]   *Id.* at 51-52, 68.

In *Davis*, the statements at issue were made to a 911 operator.[8] The caller told the operator that her ex-boyfriend was "here jumpin' on me again." The operator asked if Davis had any weapons, and the caller replied, "No. He's usin' his fists." As the conversation continued, the operator learned that the caller's ex-boyfriend had "just r[un] out the door" after hitting the caller, so the operator continued gathering information to help identify and locate the ex-boyfriend.[9]

In *Hammon*, the statements were made to law enforcement personnel at the scene of a domestic violence dispute.[10] When police officers arrived, they found a woman alone on the front porch of the home. Her husband was in the kitchen. The officers split up to speak with the two individuals separately. The officer speaking to the woman "asked [her] what had occurred," and she responded with a narrative of events.[11]

The Supreme Court determined that the statements made during the 911 call in *Davis* were not testimonial but that the statements made to the police in *Hammon* were testimonial.[12] The Court explained that the critical question in assessing whether a statement is "testimonial" is determining the "primary purpose" of the statement: If the statement is made under circumstances objectively indicating that the primary purpose of the questioning is to enable the police to meet an ongoing emergency, the statement is non-testimonial. If, however, the primary purpose of the hearsay statement is "to

---

[8] *Davis v. Washington*, 547 U.S. 813, 817-18 (2006).

[9] *Id.* (alteration in original).

[10] *Id.* at 819-20.

[11] *Id.*

[12] *Id.* at 828-30.

establish or prove past events potentially relevant to later criminal prosecution," the statement is testimonial.[13]

In *Davis*, the Supreme Court held that the statements made during the 911 call were part of an ongoing emergency because the caller "was speaking about events *as they were actually happening*" and the "elicited statements were necessary to be able to *resolve* the present emergency."[14] In *Hammon*, by contrast, the Supreme Court determined that the statements made to officers at the scene were testimonial because the officers' purpose "was to investigate a possible crime" and the statements were a "narrative of past events . . . delivered at some remove in time from the danger . . . described."[15]

As we later summarized in *Anderson v. State*, there were at least three important distinctions between *Davis* and *Hammon*:

> First, the victim in *Davis* was alone, unprotected by the police, and in immediate danger; in contrast, the victim in *Hammon* was in the presence of police officers and was protected from immediate danger. Second, the victim in *Davis* was speaking in the present tense, while the victim in *Hammon* gave the police a "narrative of past events . . . delivered at some remove in time from the danger she described." And third, the victim in *Hammon* executed an

---

[13] *Id.* at 822; *see also Michigan v. Bryant*, 562 U.S. 344, 368 (2011) ("Police officers in our society function as both first responders and criminal investigators. Their dual responsibilities may mean that they act with different motives simultaneously or in quick succession.").

[14] *Davis*, 547 U.S. at 822, 827 (emphasis in original).

[15] *Id.* at 830, 832.

affidavit for the specific purpose of recording past events for use in an official investigation.[16]

Later, in *Michigan v. Bryant*, the Supreme Court reiterated that, in determining whether a statement is testimonial, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter.[17]  The critical question is the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.[18]  Objective factors bearing on whether the "primary purpose" of an encounter is to resolve an ongoing emergency or "simply to learn . . . what . . . happened in the past" may include the nature of any underlying dispute, the type of weapon involved, if any, the victim's medical condition, the presence of an ongoing safety threat, the formality of any interview or interrogation, and the contents of both the questions asked and the answers given.[19]

*Why we conclude that C.H.'s statements during the 911 call were not testimonial*

Gomez first challenges the admission of certain statements that C.H. made during the 911 call.  He concedes the admissibility of the initial portion of the call, during which C.H. told the 911 dispatcher that she was upstairs in Apartment #4, requested officer assistance, and asked, "[C]an you please hurry?  Because the guy downstairs is pulling a knife out on everybody."  But he contends that the conversation that followed

---

[16]  *Anderson v. State*, 163 P.3d 1000, 1003 (Alaska App. 2007).

[17]  *Michigan v. Bryant*, 562 U.S. 344, 360 (2011).

[18]  *Id.*

[19]  *Id.* at 363-70.

was testimonial. During that portion of the conversation, the dispatcher asked, "Do you know who it is?" and C.H. replied, "No, he . . . just pulled my pants off, and he held a knife to my neck and tried to rape me, and his brother talked him out. . . . I don't know what they're doing right now."

But these facts align closely with the 911 call at issue in *Davis*. C.H. called 911 to seek immediate law enforcement intervention, and the dispatcher's questions were intended to meet that need. It is true that, as Gomez argues, the portion of the 911 call to which he objected — C.H.'s statement that he had "tried to rape" her — was phrased in the past tense, which may suggest that a statement is testimonial.[20] But tense is not a decisive factor in determining the "primary purpose" of an encounter. And here, immediately before making this statement, C.H. asked the dispatcher, "[C]an you please hurry? Because the guy downstairs is pulling a knife out on everybody." The statements that followed provided additional context for the ongoing emergency, including that the suspect might still be armed. (Indeed, just moments later, in a portion of the 911 call that was not played for the jury, C.H. told the dispatcher that she could still hear arguing in the apartment downstairs.)

Given the statements of C.H. and the context in which the 911 call occurred, a reasonable person would understand that the primary purpose of the conversation was to obtain assistance in resolving an ongoing emergency, not to establish past facts for the purpose of future prosecution. Other courts have consistently held that statements made under similar circumstances are not testimonial.[21]

---

[20] *See Anderson*, 163 P.3d at 1003 (noting that "the victim in *Davis* was speaking in the present tense, while the victim in *Hammon* gave the police a 'narrative of past events'" (quoting *Davis*, 547 U.S. at 832)).

[21] *See, e.g.*, *State v. Williams*, 462 P.3d 832, 837 (Utah App. 2020) (holding that
(continued...)

This is not to suggest that all statements made during a 911 call are non-testimonial. The Supreme Court has expressly acknowledged that "a conversation which begins as an interrogation to determine the need for emergency assistance" can "evolve into testimonial statements."[22] Indeed, in *Davis* itself, the Court noted that, once the 911 operator gained the information needed to address the exigency, the emergency seemed to end and the statements made after that appeared to be testimonial.[23] The prosecutor in this case acknowledged that, at some point, the statements C.H. made during the 911 call likely became testimonial and thus he sought to admit only a short initial segment of the call in which the 911 dispatcher was trying to assess the emergency situation in

---

[21] (...continued) statements in 911 call detailing assailant's identity and location were primarily made to enable police to adequately respond); *Commonwealth v. Wilson*, 113 N.E.3d 902, 911 (Mass. App. 2018) (holding that admission of statements made during a 911 call that consisted of a request for police assistance and a brief description of the incident were non-testimonial); *see also State v. Lemieux*, 2019 WL 2415253, at *2 (Minn. App. June 10, 2019) (unpublished) (holding that a 911 call made from a hospital was part of ongoing emergency because suspect's location was unknown and the statements focused on determining the suspect's current whereabouts and physical description); *Rosenbusch v. State*, 2018 WL 6837741, at *2 (Tex. App. Dec. 28, 2018) (unpublished) (holding that two 911 calls were part of an ongoing emergency because the assault had just taken place, the victim was injured, the whereabouts of the assailant were unknown, and law enforcement presence was being requested at scene); *cf. Johnson v. State*, 2014 WL 5799693, at *3 (Alaska App. Nov. 5, 2014) (unpublished) (no plain error in admission of 911 call, even though caller did not testify at trial, because caller appeared to be describing an ongoing emergency after a woman was assaulted by her boyfriend and fled to the caller's nearby apartment).

[22] *Bryant*, 562 U.S. at 365 (quoting *Davis*, 547 U.S. at 828).

[23] *Davis*, 547 U.S. at 828-29.

order to best coordinate a police response.[24]   Under the circumstances of this case, we agree that this initial portion was not testimonial.

In the alternative, Gomez argues that, even if C.H.'s statements made during the admitted portion of the 911 call were not testimonial and were therefore admissible under the confrontation clause of the federal constitution, the confrontation clause of the Alaska Constitution should be construed more broadly to preclude the statements because the State failed to show that C.H. was unavailable.[25]   But this argument is not well-developed, and, in any event, Gomez never raised this issue in the trial court.  As a result, the State was not on notice of the need to detail the efforts it had made to secure C.H.'s presence, and the trial court did not make any relevant rulings. Indeed, Gomez acknowledges that "the extent to which the State attempted to secure C.H.'s presence at trial is unclear" from the record.  For these reasons, Gomez has failed to preserve this claim for our review.[26]

---

[24]   *See id.* at 827 (acknowledging that while "one *might* call 911 to provide a narrative report of a crime absent any imminent danger," at least the initial interrogation that occurs as part of the 911 call "is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance" (emphasis in original)).

[25]   *See* 6 Wayne R. LaFave, *Criminal Procedure* § 24.4(a), at 513-14 (4th ed. 2015) (noting that the Supreme Court has interpreted the confrontation clause of the Sixth Amendment to bar only the admission of *testimonial* hearsay and explaining that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law" (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))).

[26]   *See Berezyuk v. State*, 282 P.3d 386, 401 (Alaska App. 2012).

*Why we conclude that C.H.'s statements to Officer Mills were testimonial*

Gomez next challenges the admission of the statements that C.H. made to Officer Mills after Mills arrived on the scene. Gomez argues that these statements were testimonial because they did not relate to a present threat or ongoing emergency.

When Mills arrived on scene, she noted that several officers were already outside of Gomez's downstairs apartment and proceeded upstairs to speak with C.H. After confirming C.H.'s identity, Officer Mills asked, "[C]an you give me a description of what happened?" C.H. told Mills that "the guys downstairs" had invited her over to drink and "Eric" had held a knife to her neck and "was trying to rape me." C.H. stated that "Salvador came in and was like, 'what the fuck are you doing?'" before giving C.H. a "chance to get away." Mills then asked, "Did you actually get injured anywhere?" C.H. responded, "I don't know, he held it to my neck, and I just told him to take what he wanted because I was scared." Just as Mills started talking with C.H., she briefly stepped out into the hallway and saw the other officers detaining a man downstairs.

Having reviewed the record, we agree with Gomez that the statements and actions of Mills and C.H., and the circumstances surrounding their conversation, objectively demonstrate that the primary purpose of this conversation was to establish past events, not to resolve an ongoing emergency — and that the statements were therefore testimonial.

When Mills first encountered C.H., C.H. was in a position of relative safety, behind a closed door in another apartment on a different floor of the building. Nothing indicated that C.H. required immediate medical assistance. And in contrast to C.H.'s statement on the 911 call that Gomez was presently "pulling a knife out on everybody," Officer Mills and C.H. spoke at a remove about events that had already occurred. In *Hammon*, the Supreme Court held that similar on-scene statements were testimonial in

part because the interrogation was conducted in a separate room, away from the alleged perpetrator, and the purpose of the interrogation was to investigate a possible crime.[27]

Indeed, in the trial court, the prosecutor acknowledged that by the time Mills arrived, the situation had been somewhat "diffused" and that the admission of C.H.'s statements to Mills presented a "closer question" than admission of the initial portion of the 911 call since the police had effectively secured the scene by then.

However, the State maintains that C.H.'s statements to Mills were non-testimonial for several reasons.

First, the State asserts that C.H. informed Mills which man had attacked her and that he had a knife — information that was necessary for the police to assess the risk of ongoing danger to the police and to the public. But C.H. had already reported in her 911 call that the suspect had a knife, and she had provided his name, a description of his clothing, and his location. In particular, in a later portion of the 911 call that was not played for the jury (but that the judge listened to in ruling on the admissibility of C.H.'s statement), C.H. identified the suspect as "Eric" and the person who had helped her escape as "Salvador."

Thus, according to two police reports submitted by the prosecutor to the court (and referred to by the prosecutor at the pretrial hearing), the responding officers knew the names of the individuals involved before Mills arrived on scene. In particular, Officer Mills wrote in her police report that, while she was en route to the scene, "dispatch advised . . . [that] the suspect was still believed to have been in #1," the downstairs apartment, and "[t]he suspect was named as ERIC." Thus, contrary to the

_____

[27] *See Davis*, 547 U.S. at 830 (discussing the facts of *Hammon v. Indiana*).

State's assertion, this is not a case in which the police did not know who the perpetrator was or where he was located.[28]

Second, the State notes that when Mills arrived, Gomez had not yet been apprehended. But Gomez was reported to be in Apartment #1, and Mills saw multiple officers outside that door. Mills reported that, upon seeing these officers, she proceeded to Apartment #4 to speak with C.H. Once there, she asked no questions aimed at determining whether Gomez had left his apartment — and early in her conversation with C.H., she saw a man being detained outside the downstairs apartment. The State does not explain how Mills's questions to C.H. were directed at remedying any theoretical concern that Gomez would initiate a struggle or attempt to flee.

And even if there was some uncertainty about whether Gomez had been detained, as the Supreme Court stated in *Bryant*, an emergency is not necessarily "ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose."[29] Here, like the complaining witness in *Hammon*, C.H. was being questioned in a different location than the suspect by an officer seeking to establish the facts of what had happened. The objective circumstances indicated that the emergency surrounding C.H. had abated and that the primary purpose of Mills's interview with C.H. "was to investigate a possible crime" and obtain a "narrative of past events."[30]

---

[28] *See id.* at 832 ("But in cases like this one, where [the victim's] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial.").

[29] *Michigan v. Bryant*, 562 U.S. 344, 365 (2011).

[30] *Davis*, 547 U.S. at 830-32. *Cf. Springer v. State*, 2011 WL 676157, at *6 (Alaska App. Feb. 23, 2011) (unpublished) (holding that statements made to a police officer on the

(continued...)

Finally, the State argues that it was possible that C.H. had been injured. In *Anderson*, an officer asked questions "directed toward ascertaining the nature and extent of [the victim's] injuries" after arriving on scene and hearing the victim state he was hurt and having difficulty breathing.[31] We concluded that the victim's responses were non-testimonial, noting that, when the officer arrived on scene, she knew only that someone was hurt and needed help, but did not know a crime had been committed.[32]

Here, by contrast, C.H. reported that a man had tried to rape her at knifepoint, and that she had been able to flee to another apartment. When Mills spoke with C.H., C.H. told her she did not know whether she was injured and showed no outward signs of serious injury.[33]

---

[30] (...continued)
scene were non-testimonial when the officer's "questions dealt almost exclusively with (1) discovering the extent of [the victim's] need for medical assistance, (2) eliciting information that the officers would need to identify and locate the man who had just assaulted [the victim], and (3) finding out whether this man was armed").

[31] *Anderson v. State*, 163 P.3d 1000, 1004-05 (Alaska App. 2007).

[32] *Id.* at 1004; *see also Luch v. State*, 413 P.3d 1224, 1234-35 (Alaska App. 2018) (holding that statements were non-testimonial when the victim had suffered two gunshot wounds and the questions and answers were relevant to sort out the ongoing emergency and to communicate the nature of the victim's injuries).

[33] Officer Mills noted in her police report that C.H. "had a straight thin, red line across her neck about two inches long." But Mills also noted that "there was no blood," and she did not mention any other observable injuries.

After speaking with C.H., Mills took her to a multidisciplinary center, where C.H. was initially reluctant to undergo a sexual assault examination. At one point, C.H. left but ultimately returned and completed the examination. The examining nurse observed a bruise on C.H.'s neck and bruises on her forearms, some of which C.H. reported had not been there prior to that night and one of which C.H. identified as pre-dating the incident involving Gomez.

As the proponent of the evidence, the State bore the burden of establishing that C.H.'s statements were non-testimonial.[34] We conclude that the State did not meet this burden. More specifically, we hold that, taken as a whole, the circumstances of the conversation between Mills and C.H. indicate that its primary purpose was to establish past events, not to respond to an ongoing emergency.[35]

---

[34] *See United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir. 2013) ("Significantly, the government bears the burden of defeating a properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial." (internal quotations and alteration omitted)); *State v. Alers*, 123 A.3d 825, 830 (Vt. 2005) ("The State, as the party seeking to introduce the out-of-court statement into evidence, bears the burden of showing that proffered statements are nontestimonial."); *see also Frye v. United States*, 86 A.3d 568, 571 (D.C. 2014); *State v. Koslowski*, 209 P.3d 479, 483 n.3 (Wash. 2009) (en banc). *Cf. Bentley v. State*, 706 P.2d 1193, 1197 n.2 (Alaska App. 1985) (noting that the burden of proving the declarant's unavailability was "on the prosecution as the proponent of the recorded evidence").

[35] *See, e.g.*, *Commonwealth v. Rand*, 170 N.E.3d 324, 337-38 (Mass. 2021) (holding that statements made by victim to police officer on scene were testimonial because, even though suspect was still at large, ongoing emergency had dissipated and victim was in company of police officer); *Legree v. State*, 812 S.E.2d 68, 71 (Ga. App. 2018) (concluding that a victim's statements to police officer after the defendant and the victim had been separated and the defendant posed no apparent threat were testimonial); *Commonwealth v. Wilson*, 113 N.E.3d 902, 914 (Mass. App. 2018) (holding that statements made by the victim to a police officer on the scene were testimonial because "'[n]othing in the record indicate[d] that [the officer's] questioning . . . was designed to secure the scene' or to 'inquir[e] about any medical needs'" (quoting *Commonwealth v. Gonsalves*, 833 N.E.2d 549 (2005) (alterations in original))); *Alers*, 123 A.3d at 830-31 (holding that statements by victim were testimonial when there were several officers already on scene and the victim was not suffering from any physical injuries); *Koslowski*, 209 P.3d at 490 (holding that victim's statements were testimonial when, by the time the officer arrived and spoke to the victim, there was no ongoing emergency or current crime in progress).

We therefore conclude that the statements to Mills were testimonial and that, because C.H. did not testify at trial and Gomez had no prior opportunity to cross-examine C.H., their admission violated Gomez's right to confrontation.[36]

*Why we conclude that the erroneous admission of C.H.'s statements to Officer Mills was not harmless beyond a reasonable doubt*

The admission of C.H.'s statements to Officer Mills violated Gomez's right to confrontation and was therefore an error of constitutional magnitude. Accordingly, to secure an affirmance of Gomez's conviction, the State must establish that the error was harmless beyond a reasonable doubt.[37] The State does not argue that any error in admitting one or both of the statements is harmless beyond a reasonable doubt. And having reviewed the record, we conclude that the State cannot meet this burden.

As we noted earlier, none of the individuals present in the apartment at the time of the incident testified at trial. Thus, the State's case relied primarily on C.H.'s two recorded statements, as well as on Gomez's statements to Detective Torres. And Gomez attacked the reliability of his own statements by challenging Torres's interrogation style and noting the different forms of Spanish each person spoke.

Although the contents of C.H.'s two statements were similar, the trial court expressly found that the admitted excerpt of C.H.'s statements to Mills was not cumulative to the admitted excerpt of her statements to the 911 dispatcher. The court noted that, in the portions of the statements played at trial, C.H. only named the suspect and identified who did what (*i.e.*, Gomez or Salvador) in her statements to Mills. Indeed,

---

[36] *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.").

[37] *Smith v. State*, 81 P.3d 304, 309-10 (Alaska App. 2003).

for this same reason, the court found that C.H.'s statements to Mills were prejudicial — though not unduly so for purposes of the balancing test under Evidence Rule 403.

Moreover, Gomez's primary strategy at trial was to attack C.H.'s credibility. Gomez presented evidence that C.H. spoke with his defense team after the incident and explained that she did not want him to be prosecuted, did not want to cooperate with the proceedings, and sometimes struggled to discern reality due to her bipolar disorder — for which she had not been taking her medication at the time of the incident. Gomez also established that C.H. had previously been charged with making a false report and presented evidence suggesting that she made a prior false sexual assault allegation. (Indeed, during deliberations, the jury asked to listen to a playback of an audio exhibit of the defense investigator's interview with C.H. in the unrelated case against her alleged prior assailant in which she was deemed a favorable witness.) And in closing argument, Gomez argued that C.H. had fabricated the accusation of sexual assault against Gomez in order to avoid punishment for her own probation violation.

Given that C.H.'s credibility was a central issue in the case, the consistencies that did exist in the substantive content between her 911 call and her statements to Mills would almost certainly have bolstered C.H.'s credibility in the eyes of the jury — and weakened Gomez's defense that he did not fully understand Torres's line of questioning.

For these reasons, we conclude that the error in admitting C.H.'s on-scene statements to Mills was not harmless beyond a reasonable doubt, and we must therefore reverse Gomez's conviction.

*Why we conclude that there was sufficient evidence to support Gomez's conviction*

Gomez raises two additional claims. First, Gomez argues that the prosecutor made comments during cross-examination of the defense investigator and during closing arguments that improperly shifted the State's burden of proof to the defense. Second, Gomez argues that the State presented insufficient evidence that he intended to penetrate C.H., as required to support his conviction for attempted first-degree sexual assault.[38]

Because we are reversing Gomez's conviction on confrontation clause grounds, and Gomez is entitled to a new trial, we need not address Gomez's first claim. However, we must address Gomez's second claim because, if Gomez is correct that there was insufficient evidence to support his conviction, then the prohibition on double jeopardy would bar the State from retrying Gomez.[39]

In evaluating the sufficiency of the evidence to support a conviction, we are required to view the evidence — and all reasonable inferences to be drawn from that

---

[38] To establish that Gomez committed attempted first-degree sexual assault, the State was required to prove that Gomez intended to engage in sexual penetration with C.H. without her consent, that he recklessly disregarded her lack of consent, and that he took a substantial step toward engaging in sexual penetration with C.H. *See* AS 11.41.410 & AS 11.31.100; *see also* AS 11.41.470(10) (defining "without consent"); *Reynolds v. State*, 664 P.2d 621, 625 (Alaska App. 1983) (recognizing that, to establish a violation of AS 11.41.410, the State must prove that the defendant knowingly engaged in sexual penetration and recklessly disregarded the alleged victim's lack of consent).

[39] *See Burks v. United States*, 437 U.S. 1, 11 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.").

evidence — in the light most favorable to the jury's verdict.[40] Viewing the evidence in that light, we conclude that the evidence was sufficient to permit a reasonable juror to find Gomez guilty beyond a reasonable doubt.[41] We accordingly reject Gomez's challenge to the sufficiency of the evidence to support his conviction.

*Conclusion*

The judgment of the superior court is REVERSED. This case is remanded for a new trial.

---

[40] *Augustine v. State*, 355 P.3d 573, 590 (Alaska App. 2015); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[41] *See Iyapana v. State*, 284 P.3d 841, 848-49 (Alaska App. 2012).