# IN THE COURT OF APPEALS OF IOWA

No. 22-1259
Filed August 30, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**VESTER MATTHEW RAWLINS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Coleman McAllister (preliminary questions of admissibility) and Jeanie Vaudt (motion in limine, trial, and sentencing), Judges.

A defendant appeals his criminal convictions, challenging the admission of evidence and failure to merge the convictions. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Ahlers, P.J., Badding, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BADDING, Judge.**

Faced with unavailable witnesses in a domestic-violence prosecution, the State relied on a 911 call recording and body-cam footage from a responding police officer to prove its case against Vester Matthew Rawlins. With that evidence, a jury convicted Rawlins of simple assault and domestic abuse assault causing bodily injury. Rawlins appeals both convictions,[1] raising several claims, including that the district court erred in admitting the body-cam footage because it contained testimonial statements that violated his right to confrontation. We reverse and remand for a new trial.

**I.      Background Facts and Proceedings**

On November 23, 2021, at 2:17 a.m., an unidentified female called 911 and provided the address of an apartment as it was being told to her by someone else. After receiving the address, the dispatcher questioned: "What's going on there?" The caller responded in a hushed and hurried voice: "I—it's just—it's bad, uhm." The dispatcher told the caller that she could barely hear her, and the caller responded: "I know, I—I need you guys to be here real soon." The dispatcher asked what was happening, and the caller answered that "someone is assaulting someone else." Faint yelling could be heard in the background. When asked whether any weapons were involved, the caller said that she didn't know for sure.

In response to further questions, the caller explained it was "male versus female," the suspect's name was "Matt," and he was assaulting his wife, who had asked her to call 911. The dispatcher then asked for a description of "Matt" in case

---

[1] Rawlins was granted discretionary review as to his conviction for simple assault.

he took off.  The caller said he was white and 6'2".  After the dispatcher asked what he was wearing, the yelling in the background got louder.  There was a long pause, and then the caller said, "I have to go."  The yelling escalated, continuing until the call ended.

The dispatcher classified the call "as a priority one, domestic fight," which meant it would be "dispatched immediately" because the caller "said there was an assault currently taking place."  Officer Tyler Kelley got to the apartment around 2:20 a.m., about three minutes after the call came in.  Footage from the officer's body cam shows that he was met at the front door of the apartment by a black male.  Officer Kelley immediately asked: "Anybody yelling in here or anything?"  The male calmly responded, "Uh, yeah, there was a little bit of shouting going on," as he led the officer into the apartment.  Officer Kelley followed the male into the living room, where one female was sitting on a couch and another was sitting on a chair in the corner with a towel over her mouth.  Officer Kelley asked, "Is the problem still here?"  The male and one of the females simultaneously responded.  The female stated: "I think he went out the door, I think he went out the downstairs door," while the male said: "Uh, no, he went out the back door.  Like right when he saw a car pull up, man he just wigged out."

Officer Kelley then questioned: "So what happened I guess, or what's, just yelling or what's going on?"  The female in the corner with the towel over her mouth responded: "No, he physically—he knocked my tooth out, he busted me in the face."  The other female stated: "Her nose is all bruised."  Officer Kelley responded, "Oh, okay," and pulled out his pen and notepad while another officer asked: "What's he wearing?"  The group collectively responded jeans and a green hoodie.

Officer Kelley asked the injured female her relationship with the suspect, and she said they were husband and wife. He then asked for her name, date of birth, and phone number, as well as "his name," date of birth, and residence. She gave the officer that information, identifying Rawlins by name. Officer Kelley wrote the information down as it was given to him and asked again, "Alright so what happened tonight?" Rawlins's wife described the assault in more detail, with some input from the other two witnesses.

A warrant was issued for Rawlins's arrest, and he was caught about one week later. In late December, Rawlins's wife moved to terminate the no-contact order issued after his arrest. She stated, "I have thought long and hard and have decided to recant any previous statements I have made. I will not testify against my husband in any further proceedings." The State proceeded with its prosecution, filing a trial information in January 2022 that charged Rawlins with assault without intent causing serious injury, first-degree harassment, and domestic abuse assault causing bodily injury. The trial information was later amended to remove the harassment charge.

After the three witnesses at the apartment failed to appear for defense depositions, the State moved for a preliminary determination of the admissibility of the 911 call and body-cam footage under Iowa Rule of Evidence 5.104. The State argued the statements made in those recordings would not violate the Confrontation Clause if the witnesses were unavailable for trial because they were "made during an ongoing emergency investigation" and were therefore nontestimonial. As for the hearsay obstacle to admissibility, the State argued the statements qualified as present sense impressions, excited utterances, and

residual hearsay.  Rawlins resisted, asserting the statements were testimonial hearsay not subject to an exception.

An evidentiary hearing was held in May, at which the 911 call, the full thirty-minute version of the body-cam footage, and Officer Kelley's deposition were admitted.  The court also admitted the State's redacted body-cam video, clocking in at about twelve minutes, that omitted the parts where the officer was "sitting in his car or walking back and forth."  After considering this evidence, the court ruled that the statements made during the 911 call and the first 2:25 minutes of the State's redacted body-cam video—up until Officer Kelley asked a second time, "Alright so what happened tonight?"—were nontestimonial.  The court deferred ruling on whether those statements met a hearsay exception, but definitively excluded any statements after the 2:25 mark "absent production by the State of the declarants at trial so that they are available for cross-examination."

On the morning of trial a few weeks later, Rawlins filed a motion in limine requesting exclusion of (1) the body-cam video "after the :46 second mark"—when the officer learned Rawlins had fled—on confrontation and hearsay grounds, and (2) all of the 911 call as hearsay.  The court stood by the prior ruling as to Rawlins's confrontation argument with the body-cam video and reserved ruling on the hearsay issues.  After jury selection, but before opening statements, the State presented testimony from dispatcher Kelli Larkins, who received the 911 call, and Officer Kelley in an offer of proof.  With this additional information, the court denied Rawlins's motion in limine, concluding the statements in the 911 call and body cam were excepted from the hearsay rule as present sense impressions.

Knowing that evidence was coming in, the defense focused its opening statement on the witnesses the State was *not* calling at trial:

> When [O]fficer Kelley arrived, there was not one, not two, but three people in that apartment. You shouldn't expect to hear from any of them. You won't be able to judge whether or not they're telling you the truth, whether or not they're lying, whether or not this was a story—nothing—because they won't be here. You won't be able to hear explanations as to why they said some things. Why won't you hear from any of them? We don't know.

Consistent with the defense's expectation, the State's evidence did not include the three witnesses at the apartment. Instead, the State admitted the 911 call through dispatcher Larkins's testimony, and the first 2:25 minutes of the body-cam video through Officer Kelley's testimony. Larkins also testified that in her opinion, the female caller was "scared, very hesitant to talk," and "[t]here was yelling in the background" from someone who "sounded like a male." And she agreed that it appeared "the caller was reporting what was happening in the moment"—a "male assaulting his wife." For his part, Officer Kelley testified that when he got to the apartment, Rawlins's wife "was sitting in a chair. She had a towel over her mouth because her mouth was still bleeding from getting a tooth knocked out by the defendant, and she was kind of like cowering in the corner with the towel over her mouth." Based on her body language, Officer Kelley thought that she was "fearful that Mr. Rawlins, the defendant, would return and possibly assault her further." And the officer was concerned for her safety "because at that point [he] was unable to locate the defendant." Before going to look for Rawlins, however, Officer Kelley took pictures of the wife's injuries, which were also admitted into evidence.

The jury found Rawlins guilty of the lesser-included offense of simple assault under count one and domestic abuse assault causing bodily injury under count two. Rawlins appealed following the imposition of sentence.

## II.    Analysis

Although Rawlins raises other issues on appeal, which we will touch on as they may arise on remand for new trial, his confrontation claim under the federal and state constitutions is dispositive.[2] We review that constitutional claim de novo. *See State v. Montgomery*, 966 N.W.2d 641, 649 (Iowa 2021).

"The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (alteration in original). The amendment "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). Since that formulation of the amendment was adopted in *Crawford*, "[m]uch of modern confrontation clause jurisprudence turns on the question of whether the evidence is 'testimonial' in nature." *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020); *accord Clark*, 576 U.S. at 244 ("Our more recent

---

[2] Because Rawlins has not argued article 1, section 10 of the Iowa Constitution should be interpreted differently than the Confrontation Clause in the Sixth Amendment to the United States Constitution, "we construe the provisions identically." *State v. Shipley*, 757 N.W.2d 228, 234 (Iowa 2008).

cases have labored to flesh out what it means for a statement to be 'testimonial.'").

And so it is here.[3]

In answering that question, we are guided by the United States Supreme Court's combined decisions in *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), a pair of domestic-violence cases. In *Davis*, the Court considered whether statements made by a victim during a 911 call were testimonial, 547 U.S. at 817–18, while in *Hammon*, the Court examined statements made by a victim at the scene of the domestic disturbance with her husband in a different room. *Id.* at 819–20. "To address the facts of both cases," the court "expanded on the meaning of 'testimonial'" and "discussed the concept of an ongoing emergency," explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Michigan v. Bryant*, 562 U.S. 344, 356 (2011) (quoting *Davis*, 547 U.S. at 822). Courts are to "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties" in determining the primary purpose of an interrogation. *Id.* at 359.

---

[3] On appeal, Rawlins also contends the "State failed to establish the declarants were unavailable." We agree with the State that this claim was not raised or decided in district court, so we will not address it on appeal. *See State v. Bynum*, 937 N.W.2d 319, 324 (Iowa 2020) (noting that even with constitutional issues, "[i]t is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we decide them on appeal" (citation omitted)).

The existence of an ongoing emergency at the time of the police encounter, while not determinative, "is among the most important circumstances informing the 'primary purpose' of an interrogation." *Id.* at 361; *accord Clark*, 576 U.S. at 245 (noting an ongoing emergency "is simply one factor" that informs the inquiry (quoting *Bryant*, 562 U.S. at 366)). This is because "an emergency focuses the participants on something other than proving past events potentially relevant to later criminal prosecution," that being "ending a threatening situation." *Bryant*, 562 U.S. at 361 (cleaned up). "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363. Domestic-violence cases—like this one—"have a narrower zone of potential victims than cases involving threats to public safety," according to the Supreme Court. *Id.* As a result, the Court has "focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat to *them.*" *Id.* The use of a weapon also affects whether there is an ongoing emergency, as does the medical condition of the declarant. *Id.* at 364. And, notably for this case, nothing "suggests that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose." *Id.* at 365. In the end, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 370–71.

Under those principles, the Court in *Davis* found that statements made by a victim in a 911 call during and shortly after her boyfriend's attack were not testimonial. 547 U.S. at 829. Significant to the Court's reasoning was that the caller "was speaking about events *as they were actually happening*, rather than

describing past events." *Id.* at 827 (cleaned up). And her "call was plainly a call for help against bona fide physical threat," with the questions asked and the answers given "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Id.* In contrast, the statements made by the victim in *Hammon* at the scene of the domestic disturbance with her assailant in a different room were testimonial. *Id.* at 830. Unlike *Davis*,

> There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything. When the officers first arrived, [the victim] told them that things were fine, and there was no immediate threat to her person. When the officer questioned [her] for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . .

*Id.* at 829–30. Also key to the Court's decision was that the assailant in *Hammon* "was armed only with his fists when he attacked his wife," so removing her "to a separate room was sufficient to end the emergency." *Bryant*, 562 U.S. at 364.

So let's look at what happened here. Immediately after Officer Kelley entered the apartment and asked the witnesses, "Is the problem still here?" he was told that Rawlins had left. Rawlins argues "[f]rom that point on, Kelley's questions and the corresponding responses were not addressing any ongoing emergency; their primary purpose was to establish or prove past events in a criminal prosecution." In response, the State asserts there was an ongoing emergency, pointing to Rawlins's recent flight, his unknown whereabouts, and the concern that he would return to the apartment and carry out his threat of murder-suicide—a threat the officer only learned about toward the end of the interaction, in the portion of the body-cam video the district court excluded from evidence.

But in making this argument, the State acknowledges the emergency was "at a pause" when the challenged statements were made. After Officer Kelley learned that Rawlins had fled, his focus turned investigative when he asked, "So what happened I guess, or what's just yelling or what's going on?" *See id.* at 365 (noting a conversation that begins as an inquiry to determine the need for emergency assistance can evolve into testimonial statements). He was not trying to find out where Rawlins could have gone so that officers could end any threat; instead, he was trying to establish the circumstances of the assault—"what happened," not "what was happening." *Davis*, 547 U.S. at 830; *accord Commonwealth v. Wilson*, 113 N.E.3d 902, 915 (Mass. Ct. App. 2018) (noting officer's concern "about the defendant's whereabouts was satisfied when the defendant's wife told him that the defendant had left the scene," with the rest of the conversation focused on historical facts about the crime).

At that point, there was no indication of an immediate ongoing threat to the victim, the police, or the public. *See State v. Bassett*, No. 21-0923, 2022 WL 16630788, at *7 (Iowa Ct. App. Nov. 22, 2022) (finding no emergency where victim advised officers that her boyfriend left, thus "reducing the risk both to herself and the deputies"). Rawlins had fled the scene in his vehicle, a weapon was not involved, and the victim did not need medical attention. *See Andrade v. United States*, 106 A.3d 386, 389 (D.C. Ct. App. 2015) (relying on the same circumstances as support for the conclusion that there was no ongoing emergency); *cf. State v. Richards*, No. 18-0522, 2019 WL 1057886, at *5 (Iowa Ct. App. Mar. 6, 2019) (determining statements captured on body-cam video were nontestimonial where declarant, who was distraught, crying, shaking, bleeding,

and transported to the hospital, told officers the assailant had a gun and wanted her to die). It was not until later in the interview that Rawlins's wife mentioned her fear that he would come back. Her answers before then were simply describing the circumstances of the past event. *See Andrade*, 106 A.3d at 391 (finding victim's answers to an officer's questions did not "suggest a focus on dealing with an emergency" where she "did not request medical assistance" or "ask the police to take any other emergency steps," but "simply described the circumstances of the earlier incident"); *cf. State v. London*, No. 13-1461, 2014 WL 5475727, at *7 (Iowa Ct. App. Oct. 29, 2014) (finding primary purpose of officer's questions "was to 'enable him to assess the situation and to meet the needs of the victim,'" where the officer found the victim on the floor "crying, upset, and worked up" in a pool of blood and the victim kept repeating that she had been hit with a bat by the defendant, who had fled (citation omitted)); *State v. Moore*, No. 10-1283, 2012 WL 3194116, at *2 (Iowa Ct. App. Aug. 8, 2012) (concluding victim's statements to emergency personnel and an officer at the scene were nontestimonial where made "in the context of seeking help for injuries and protection from Moore, not as part of a police investigation").

We have also considered the formality of the interview. While it took place in the victim's living room, her statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," some time after the events described were over. *Davis*, 547 U.S. at 830. And after he asked what happened, Officer Kelley pulled out his note pad and pen and took notes about those past events. All of this is more like the "formal station-house interrogation in *Crawford*" than the more spontaneous statements made

during the 911 call in *Davis* or the statements made in *Bryant* by a man "lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen." *Bryant*, 562 U.S. at 366, 375.

Considering all these circumstances, we find this case is closer to the testimonial statements in *Hammon* than the nontestimonial statements in *Davis*. Other courts have reached the same conclusion in circumstances comparable to this one. *See, e.g.*, *Andrade*, 106 A.3d at 391–92 (collecting cases); *see also Wilson*, 113 N.E.3d at 917 (finding no ongoing emergency after officer learned the defendant had left and then gathered information about what happened from the victim). Because the portion of the video allowed into evidence contained testimonial statements by declarants that were unavailable and not subject to cross-examination, we agree with Rawlins that his right to confrontation was violated.

This does not end our inquiry, however, because reversal is not mandated if the State proves the error was harmless beyond a reasonable doubt. *See State v. Newell*, 710 N.W.2d 6, 25 (Iowa 2006). We find the State has not met that burden, considering that the body-cam video was the lynchpin of the State's case, which was not strong. *Id.* (considering the importance of the evidence, whether it was cumulative, the presence or absence of corroborating or contradictory evidence, the extent of cross-examination, and the overall strength of the prosecution's case). While the video may have been cumulative to some of the other properly admitted evidence in the record—like photographs of the victim's injuries—the officer's testimony was based on the same statements in the video that we found should have been excluded. *See State v. Kennedy*, 846

N.W.2d 517, 528 (Iowa 2014) (considering whether the inadmissible evidence was cumulative to the *admissible* evidence).  We accordingly find the State failed to prove the error was harmless beyond a reasonable doubt.  As a result, we reverse and remand for a new trial.  *See State v. Martinez*, No. 21-0145, 2022 WL 1487594, at *5–6 (Iowa Ct. App. May 11, 2022).

## III.    Other Issues

Although Rawlins's convictions must be reversed, we will address his claim regarding the 911 call recording because that issue is likely to come up on remand,[4] *see State v. Dudley*, 766 N.W.2d 606, 615 (Iowa 2009), as well as a merger question that implicates double jeopardy.

### A.    Hearsay—911 Call

Rawlins claims the district court erred in admitting the recording of the 911 call because it contains hearsay not subject to any exception.  *See State v. Maldonado*, 993 N.W.2d 379, 384 (Iowa Ct. App. 2023) (reviewing district court's evidentiary ruling on hearsay for errors at law).  The court found the statements made in the 911 call met the exception for present sense impressions, which applies to "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Iowa R. Evid. 5.803(1).  Rawlins

---

[4] We do not address Rawlins's claim that the district court abused its discretion in admitting testimony from a detective about why, in general, a domestic-assault victim may be reluctant to testify at trial.  Unlike the record for the 911 call recording, the record on the detective's testimony may be different on retrial, so there is not much benefit in addressing the issue now.  *See Sauer v. Scott*, 176 N.W.2d 140, 145 (Iowa 1970) ("The record may well be different on retrial and the question of whether the proper foundation was laid [for expert testimony] will arise, if at all, in a different context."); *accord State v. Hart*, 966 N.W.2d 304, 309 n.6 (Iowa Ct. App. 2021).

challenges this finding because "no evidence established where the caller was in relation to the events, whether the caller was personally observing the things described, or when they were observed." We disagree.

The 911 recording itself discloses that the caller was near the altercation. The male suspect can be heard yelling in the background throughout the recording, more muffled at first, but then louder and more clearly later on. The recording establishes the caller was in the apartment, perceiving the events as they occurred, and explaining them to dispatch while, or immediately after, they occurred. *See State v. Dessinger*, 958 N.W.2d 590, 600 (Iowa 2021) (stating the rationale underlying the exception for present sense impressions "is that the declarant has no opportunity to fabricate a statement if the statement is made during or 'immediately' after the event" (quoting *Fratzke v. Meyer*, 398 N.W.2d 200, 205 (Iowa Ct. App. 1986))). As for Rawlins's complaint about the caller's unknown identity, since the declarant need not be available for admission as a present sense impression, "lack of knowledge of the identity of declarant should not be a bar to admission of the unknown declarant's statement under the hearsay rules where the statement and surrounding circumstances indicate firsthand observation by the declarant." Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.803:1 (Nov. 2022 update). We accordingly find no error in admitting the recording of the 911 call as a present sense impression.

### B. Merger

Finally, Rawlins claims that his conviction for simple assault should have merged into his conviction for domestic abuse assault causing bodily injury under Iowa Code section 701.9 and Iowa Rule of Criminal Procedure 2.6(2).

Section 701.9—a codification of "the double jeopardy protection against cumulative punishment," *State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997)—provides:

> No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

Rule 2.6(2) similarly states, "Upon prosecution for a public offense, the defendant may be convicted of either the public offense charged or an included offense, but not both."

Rawlins argues that "[b]ecause the elements of assault are included within the elements of domestic abuse assault causing bodily injury, assault is a lesser included offense." *See State v. Folck*, 325 N.W.2d 368, 375 (Iowa 1982) ("One crime is included within another when the lesser is composed solely of some, but not all, of the elements of the greater and when the greater offense cannot be committed without committing the lesser."). The State does not contest that point, arguing instead that "there is no double jeopardy problem" because the "trial record supported . . . the jury's verdict [that] he assaulted [the victim] multiple times." *See State v. Zmuda*, No. 11-0563, 2012 WL 470201, at *2 (Iowa Ct. App. Feb. 15, 2012) ("Double jeopardy principles . . . do not apply when a defendant is convicted of multiple offenses for different assaults."); *accord State v. McKettrick*, 480 N.W.2d 52, 56 n.2 (Iowa 1992); *State v. Delap*, 466 N.W.2d 264, 266 (Iowa Ct. App. 1990).

The State is correct that where "the alleged acts occur separately and constitute distinct offenses, there can be no complaint one is a lesser-included

offense of the other." *State v. Flanders*, 546 N.W.2d 221, 224 (Iowa Ct. App. 1996) (noting the "lesser-included offense analysis addresses situations where multiple charges apply to a single occurrence"). The problem is the case was not presented to the jury in that way. *See id.* at 225 ("The State can convict a defendant of both kidnapping in the first degree and sexual abuse if there are separate and distinct occurrences of sexual abuse *and the case is presented in a manner* that requires the fact finder to make separate factual findings the separate and distinct occurrences happened." (emphasis added)).

In its opening statement, the prosecutor told the jury:

> On November 23, 2021, the defendant got into an altercation with his wife. . . . This altercation turned physical when the defendant struck his wife in the face. This gave her a bloody nose, knocked out one of her teeth, and, from that wound, blood poured out.

And in closing, the prosecutor argued: "We've proven beyond a reasonable doubt all elements of both counts. On November 23, 2023, the defendant assaulted his wife. He intended to strike her; and, when he did, he caused her to lose a tooth."

So while there may have been multiple injuries, as the State asserts on appeal,[5] the State did not argue that there were multiple acts causing those injuries. *See State v. Negrete-Ramirez*, No. 07-1059, 2008 WL 4531532, at *2 (Iowa Ct. App. Oct. 1, 2008) (rejecting the State's argument that the "district court was not obligated to merge the two convictions because defendant committed multiple assaults when he cut [the victim's] face, thumb, and arm" since the "case was presented to the jury as one continuous course of conduct"). And the jury

---

[5] The State points out that photographs of the victim's injuries "depicted a swollen nose, an abrasion on her chin, [and] a lost tooth."

"was never asked to do the fact-finding necessary to support two separate assaults." *State v. Love*, 858 N.W.2d 721, 725 (Iowa 2015). Instead, the State tried the case as "one continuing event and submitted [it] to the jury in that manner." *Folck*, 325 N.W.2d at 376. As a result, we find the simple assault conviction must be set aside. *See id.*; *see also State v. Newman*, 326 N.W.2d 788, 793 (Iowa 1982) (finding merger required where the "prosecution from start to finish was treated by all concerned as a single episode").

## IV. Conclusion

We find the body-cam video contained testimonial statements that violated Rawlins's right to confrontation. And we conclude that Rawlins's conviction for simple assault should have merged with his conviction for domestic abuse assault causing bodily injury. For these reasons, we reverse Rawlins's convictions, vacate the entry of judgment and sentence on those convictions, and remand for a new trial on the charge of domestic abuse assault causing bodily injury only.

**REVERSED AND REMANDED.**